*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0103P (6th Cir.)
File Name: 02a0103p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

JERRY H. SHARP,
          *Plaintiff-Appellant,*

          *v.*

CHARLES Q. LINDSEY,
Superintendent of Knox
County Schools, in his
individual and official
capacities, and KNOX
COUNTY BOARD OF
EDUCATION,
          *Defendants-Appellees.*

No. 00-6019

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 99-00488—Curtis L. Collier, District Judge.

Submitted: November 27, 2001

Decided and Filed: March 28, 2002

Before: JONES, NELSON, and DAUGHTREY, Circuit
Judges.

1

_____

**COUNSEL**

**ON BRIEF:** Edward L. Summers, HAYNES, MEEK & SUMMERS, Knoxville, Tennessee, for Appellant. Mary A.R. Stackhouse, Knoxville, Tennessee, John C. Duffy, WATSON, HOLLOW & REEVES, Knoxville, Tennessee, John E. Owings, KNOX COUNTY LAW DIRECTOR'S OFFICE, Knoxville, Tennessee, for Appellees.

NELSON, J., delivered the opinion of the court, in which DAUGHTREY, J., joined. JONES, J. (pp. 17-19), delivered a separate opinion concurring in the judgment.

_____

**OPINION**

_____

DAVID A. NELSON, Circuit Judge. The plaintiff, employed by the defendants as a high school principal until he was reassigned to a teaching position, claims that his principalship was taken away from him in violation of free speech and due process rights protected by the United States Constitution. Finding no violation of these rights, the district court entered summary judgment in favor of the defendants. For the reasons that follow, we shall affirm the judgment.

I

The plaintiff, Jerry H. Sharp, was Principal of Gibbs High School in Knox County, Tennessee, for 22 years. He had previously worked for 15 years as a teacher in the Knox County school system, and he retained his status as a tenured teacher after his promotion.

The chain of events that led to this lawsuit began in May of 1999, when the Knox County Board of Education undertook consideration of a system-wide student dress code. The board ultimately decided that for the time being, at least,

from proceeding in a § 1983 action. However, I still believe the result in this case is both troubling and anomalous.

Granted, Mr. Sharp can obtain an alternative remedy in a state breach of contract action. However, this remedy denies Mr. Sharp the right to seek a federal remedy where a fedeal deprivation of property has occurred. Although not all property deprivations should be subjected to constitutional scrutiny, the statutory purpose of § 1983 and the principles of justice require that constitutional violators be required to provide redress to those injured. Indeed, not all property deprivations rise to the level of that which § 1983 prohibits, but those which do require meaningful constitutional analysis. Here, however, Mr. Lindsay is free from any constitutional scrutiny.

Accordingly, by declining to find that a § 1983 due process violation is at issue, the outcome in this case contravenes the important protective purposes of § 1983. Nevertheless, because I believe that state breach of contract actions appropriately redress constitutional injuries such as the one at issue, I join in this court's conclusion despite a rather pinched view of the statute and **CONCUR** in the court's opinion.

state breach of contract action may also provide an adequate remedy for *some* deprivations of a contractually created property interest. Therefore, the reasoning of those cases should also bar a section 1983 action *when the deprivation is a simple breach of contract* and there is adequate state breach of contract action available as a remedy.

*Id.* at 1273 (emphasis added).

The court arrived at this conclusion by reasoning that actions for deprivation of property interests created from contractual rights are no different than breach of contract actions:

A state breach of contract action is most clearly an adequate remedy for a property deprivation when the only basis for federal jurisdiction is that a state actor is one of the contracting parties. . . .State common law of contracts creates the property interest at stake and that same law determines what remedy lies for the deprivation caused by the breach of the contract.

*Id.* Thus, the *Ramsey* court held that, even though the plaintiff may have a constitutionally protected interest in her accumulated sick leave days which cannot be deprived without due process of law, a § 1983 action was "an inappropriate vehicle to redress what is merely a breach of contract claim by Ramsey against the Board." *Id.* at 1274.

Based upon this rationale, the majority concludes that a breach of contract action would adequately compensate Mr. Sharp for the deprivation of his finite interest in his position as principal of Gibbs High School. Despite the intent of § 1983 to remedy the deprivation of constitutionally protected property interests, Mr. Lindsey, a violator of Mr. Sharp's constitutional rights, has been allowed to escape constitutional scrutiny on the grounds that the deprivation at issue can be "compensated adequately by ordinary breach of contract action." My colleague correctly concludes that the existence of an effective state remedy precludes Mr. Sharp

it would leave responsibility for the content of dress codes with the individual schools.

Gibbs High School created a committee to consider revising the school's existing dress code for the 1999-2000 academic year. The committee, which worked under the direction of Assistant Principal Alvin Taylor, consisted of four teachers, four parents, and three students. At the conclusion of its deliberations the committee recommended adoption of a code that would have been much stricter than the old one. Principal Sharp submitted a slightly amended version of the proposed code to Acting Superintendent Roy Mullins, and Mullins apparently signed off on it.

Defendant Charles Q. Lindsey took over as superintendent of the Knox County Schools on July 1, 1999. The revised Gibbs High School dress code soon attracted his attention, the code having become the subject of several newspaper articles and numerous complaints from parents.

Concerned about the legality of the revised code, Dr. Lindsey asked the Knox County Law Department to review it. The law department concluded that even with changes suggested by Lindsey, the code probably would not withstand a legal challenge. Dr. Lindsey therefore decided to table the revised code, allowing the dress code from Gibbs' 1998-99 student handbook to remain in effect for the 1999-2000 school year.

On July 22, 1999, Dr. Lindsey sent a memorandum to all of the principals and assistant principals in the school system explaining his decision. The next day he sent a letter to the members of the Gibbs dress code committee apprising them of the decision and thanking them for their efforts. On July 26, 1999, he had a telephone conference call with Principal Sharp and other administrators at Gibbs High School, at which time the dress code was a topic of further discussion.

Effective the same day, July 26, 1999, Dr. Lindsey and Mr. Sharp entered into a "principal employment contract"

pursuant to TENN. CODE ANN. § 49-2-303. The contract – which was subject to unilateral termination by the superintendent for "inadequate performance," among other things – specified that the term of Mr. Sharp's employment as principal would begin on July 26, 1999, and end on June 7, 2000, or upon the earlier termination of the superintendent's own employment contract with the board of education.

On August 3, 1999, without prior notice to the superintendent, Principal Sharp sent the members of the Gibbs dress code committee a letter the body of which read as follows:

"I want to express my appreciation for your efforts in revising the Gibbs High dress code. I hope that you do not feel that your efforts were in vain. After I met with your group, I made a couple of minor changes in wording, and added a statement from our current code concerning words and pictures of poor taste. This code was submitted to interim superintendent, Roy Mullins, in mid-June. At that time, I asked Mr. Mullins to let me know if this policy could be supported by the school board and administration.

We began to receive calls immediately. I defended the policy every time, calling it legal, reasonable, and enforceable. If you followed the articles in the Knoxville News Sentinel written by David Keim, you will understand that we received *no* support from the 8th district school board member or the new superintendent. [The school board's] Mr. Hunley was quoted on three occasions as saying that the policy was 'unreasonable.' Dr. Lindsey called it illegal. The July 29 News-Sentinel has an article which disputes both claims.

Mr. Taylor was directed to revise the revised code and submit it to the superintendent. His initial revision was rejected and his final revision was changed.

---

**CONCURRENCE**

---

NATHANIEL R. JONES, Circuit Judge, concurring. While I concur in the judgment reached by Judge Nelson's well-reasoned opinion, I write separately to emphasize the importance of due process protection. My colleague correctly concludes that Mr. Sharp's transfer deprived him of a contractually created and constitutionally protected property interest. However, it is important to address the intended remedial purpose of federal constitutional actions.

One essential element of an action under 42 U.S.C. § 1983 is the existence of a constitutionally protected liberty or property interest. Section 1983 creates a federal cause of action for the deprivation of liberty and property interests protected by the United States Constitution or laws. *See Bd. of Regents v. Roth,* 408 U.S. 564, 569, 92 S. Ct. 2701, 33 L. Ed. 2d 548, (1972). *Accord San Bernardino Physicians' Serv. Medical Group, Inc. v. County of San Bernardino,* 825 F.2d 1404, 1407 (9th Cir. 1987). Thus, a claimant must show he had a property interest in the property at issue before he can establish that he was deprived of his interest without due process of law.

According to *Ramsey*, not every deprivation of a constitutional interest requires a federal remedy where an adequate state law remedy exists. 844 F.2d at 1273. The *Ramsey* court cited certain Supreme Court decisions holding that a § 1983 action is inappropriate where a state tort action provides an adequate remedy for the wrong. *Id.* The *Ramsey* court then likened adequate state tort remedies to state contract remedies:

Supreme Court decisions that state law provides an adequate remedy for a liberty or property deprivation have, to date, all involved deprivations which could be remedied by a state tort action for damages. However, a

had no due process right to notice and a hearing before his reassignment – at no loss of pay – to a teaching position. The reassignment may have breached the contract, but Tennessee provides a perfectly adequate procedure for determining whether a breach has occurred and for granting redress if it did. To require Mr. Sharp to avail himself of that procedure by repairing to the courts of Tennessee – as aggrieved teacher aides did, for example, in *Cantrell v. Knox County Bd. of Educ.*, 55 S.W.3d 659 (Tenn. 2001) – does no violence to the concept of due process of law. See *Lujan v. G & G Fire Sprinklers, Inc.*, 532 U.S. 189, 195-96 (2001).

The judgment in favor of the defendants is AFFIRMED.

I have always accepted the decision of a diverse committee when charged with such a responsibility. I still support your decision.

I do regret the negative publicity for the school and community."

One who reads this letter closely might be pardoned for wondering whether the principal objective wasn't to make Mr. Sharp look good at the expense of Dr. Lindsey and Mr. Hunley. Dr. Lindsey was decidedly unhappy about the letter, in any event, and he sent Mr. Sharp a memorandum accusing him of "several inaccuracies" and stating that a meeting would be scheduled to discuss the matter further. At no time prior to the meeting, which was held on August 19, 1999, was Mr. Sharp advised that Dr. Lindsey proposed to take any adverse action against him.

Sometime after the July 26th conference call, Mr. Sharp presented a monologue (the parties call it a "skit") at a gathering of teachers held on their first day of service in the new school year. After inviting the audience to "look ahead to the year 2025," the skit said, among other things, that the only superintendent the school board had been able to elect, Dr. Charles Lindsey, had been "swept out of office in the year 2000 due to a controversy over a system-wide dress code;" that Roy Mullins had once again agreed to serve as interim superintendent; that aged assistant principal Alvin Taylor "addressed the board for the 300th consecutive time concerning a dress code for Gibbs;" that "Mr. Taylor was nearly in tears as [school board chairman] Hunley called this current attempt to satisfy the board 'unreasonable;'" and that "Gibbs personnel could see that once again the school would be floundering with no dress code and no direction."

Not surprisingly, perhaps, Dr. Lindsey found the skit offensive. As he testified at his deposition, he thought that Sharp had exhibited "extremely poor judgment" in presenting it.

Prior to the August 19th meeting, according to the deposition testimony, Dr. Lindsey had not decided what to do with Mr. Sharp. Lindsey said that he only wanted to talk to Sharp about the August 3 letter and understand why the principal had sent it. He felt that Sharp was misrepresenting him, particularly in stating that Lindsey had offered no support for the new dress code. Lindsey took it ill, moreover, that Mr. Sharp had circulated the letter without even attempting to discuss his grievances with the superintendent first. Lindsey said he considered Sharp's behavior problematic because of the close working relationship and cooperation required between superintendent and principal.

At the end of the August 19th meeting, Dr. Lindsey placed Mr. Sharp on administrative leave with pay. After taking counsel from the county law department about his options, Lindsey ultimately decided to remove Sharp as principal of Gibbs High School and reassign him to a position as math tutor at the same rate of pay. Mr. Sharp was informed of this decision at a meeting on August 30, 1999.

On September 7, 1999, Mr. Sharp was instructed to report for teaching duty at Halls High School. Instead of doing so, he took a year's medical leave of absence. Mr. Sharp is a paraplegic and diabetic, and his physician believed that a classroom environment would be difficult for him.

A week after the reassignment to Halls High, Mr. Sharp brought suit against Dr. Lindsey and the Knox County Board of Education under 42 U.S.C. § 1983. The complaint, which was filed in federal court, alleged violations of Sharp's free speech and due process rights. The defendants eventually moved for summary judgment, and their motions were granted. Mr. Sharp has taken a timely appeal.

## II

### A.   Standard of Review

Summary judgments are reviewed in this court *de novo*. See *United Nat. Ins. Co. v. SST Fitness Corp.*, 182 F.3d 447,

(citing *Mathews,* 424 U.S. at 335). And at least when a salary is at stake, the economic importance to a government employee of not losing a constitutionally protected property interest in his job looms so large that the employee is generally entitled to some kind of notice and hearing prior to being discharged. See *id*.

As stated in *Ramsey v. Bd. of Educ.*, 844 F.2d 1268, 1273 (6th Cir. 1988), however, "even when a person's means of livelihood is connected to the deprivation claim, due process does not always require a predeprivation hearing or support a section 1983 action when any interest in employment is affected." *Ramsey* went on to hold that "[w]hen a person is hired for a fixed period of time . . . and that person is dismissed prematurely, no federal cause of action lies under section 1983 to redress what is best characterized as an ordinary breach of contract." *Id.* The reason is this:

> "[A] nontenured employee's property interest in continued employment is created and defined by the employee's contract. The employee has a property interest in employment for the duration of the employment contract, but the deprivation of that finite interest can be compensated adequately by an ordinary breach of contract action." *Id.* at 1274.

Where, as here, the employee's livelihood has not been jeopardized by his allegedly premature dismissal from a fixed-term position, it is even clearer than it might otherwise be that the deprivation of the employee's finite interest is something that "can be compensated adequately by an ordinary breach of contract action." We see no justification for turning Mr. Sharp's ordinary breach of contract action into a federal constitutional case.

Paragraph 14 of the complaint filed by Mr. Sharp confirms that his claim sounds in contract: "Plaintiff avers that he has a contractual right to serve as principal of Gibbs High School, pursuant to the contract attached as Exhibit I, and that Defendants have breached that contract." Given the fixed term of the contract, it is plain under *Ramsey* that Mr. Sharp

Lindsey's retaining his own job for that period, the contract establishes a term of almost 46 weeks for the principalship. Mr. Sharp was reassigned to the position as math tutor within the stated period, which means to us that he was no longer employed as a principal. The reassignment may or may not have constituted a breach of the contract, but we think it was clearly a termination. Our conclusion is supported by the second sentence of Section 4(b): "A principal with tenure *whose contract is terminated under this section* shall be transferred to another professional position for which he is licensed and qualified." (Emphasis supplied.) It is true that § 11 of the contract allows the superintendent to amend the principal's goals and objectives annually "or upon transfer of the principal to another position," but this provision must be read in conjunction with § 4. When § 11 speaks of a transfer, it assumes that the principal employment contract has already been (to quote § 4(b)) "terminated under this section . . . ." We do not interpret § 11 as authorizing a mid-contract transfer when the superintendent does not have just cause for terminating the contract. In the absence of cause for termination, in other words, we believe that such a transfer would deprive the principal of a contractually created property interest that is protected under the Constitution.

### 2.   Due Process

"Due process" is a flexible concept that varies according to the situation. *Zinermon v. Burch*, 494 U.S. 113, 127 (1990). The adequacy of the procedures employed in a given case depends on an evaluation of three factors: (1) the nature of the private interest, (2) the efficacy of additional procedures, and (3) the government's interests. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

In employment termination cases, this means that we must balance "the private interests in retaining employment, the governmental interest in the expeditious removal of unsatisfactory employees and the avoidance of administrative burdens, and the risk of an erroneous termination." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542-543 (1985)

449 (6th Cir. 1999). The Federal Rules of Civil Procedure provide that a motion for summary judgment "shall" be granted when the papers show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). When deciding if summary judgment is proper, a court must view the evidence in the light most favorable to the nonmoving party. See *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### B.   Free Speech Claim

#### 1.   Matter of Public Concern

Mr. Sharp contends that the defendants retaliated against him for exercising his right of free speech. For a plaintiff to succeed on such a claim, it must be established that "(1) the plaintiff engaged in constitutionally protected speech; (2) the plaintiff was subjected to an adverse action or was deprived of some benefit, and (3) the protected speech was a 'substantial' or a 'motivating factor' in the adverse action." *Brandenburg v. Housing Authority of Irvine*, 253 F.3d 891, 896 (6th Cir. 2001) (citing *Mt. Healthy School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). Only the first of these elements is seriously contested here.

A public employee who seeks to prove that he has engaged in constitutionally protected speech must demonstrate that his speech touched on matters of "political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983). The defendants argue that the plaintiff's skit and his August 3 letter to the members of the dress code committee merely vented an employee grievance and did not address a matter of public concern. As the Supreme Court explained in *Connick,*

"when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a

personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Id.* at 147.

In the case at bar the district court concluded, quoting *Garvie v. Jackson*, 845 F.2d 647, 651 (6th Cir. 1988), that Sharp's speech "more closely resembled an employee's complaints regarding his superior's actions and his own responsibilities . . . than a citizen's speaking out on a matter of public decisionmaking." As far as the August 3 letter was concerned, the district court offered the following observations, among others:

"The August 3 letter was addressed only to the members of the dress code committee. Sharp used school stationery and wrote the letter in his capacity as principal. The letter criticized his direct supervisor, and characterized Lindsey's and the School Board's actions with potentially misleading generality. As for the content, Sharp's letter did not seek to bring to light wrongdoing or a breach of the public's trust. Sharp has admitted his primary purpose in writing the letter was to thank the dress code committee for their services and dismiss them. The letter does not comment on the dress code debate so much as it comments upon Sharp's relationship with the board members and his superior. When viewed in context, the letter resembles an employee's complaints about his superiors' actions and Sharp's own responsibilities more than a citizen's attempts to add to the public debate over the dress code controversy."

As to the skit, the court had this to say:

"[T]he skit was meant for performance at a closed faculty meeting. The skit, like the letter, was not addressed to the public, and focused on inter-departmental relationships that were mainly a matter of personal (or personnel), as opposed to public, concern. 'To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark – and certainly every criticism directed at

contours of that interest depend, of course, on the terms of the contract.

The introductory sentence of Mr. Sharp's contract reads as follows: "This contract is intended to comply with the provisions of Tennessee Code annotated, § 49-2-303, which requires the superintendent of schools to employ school principals under individual written contracts." Section 2, captioned "Term of Contract," provides that "[t]his contract shall begin on July 26, 1999 and shall end on June 7, 2000, or the date the superintendent's employment contract with the board of education ends, whichever is earlier." The fourth section of the contract deals with termination. Section 4(b) reads thus:

"This contract may be unilaterally terminated by the superintendent for the inadequate performance or for any of the causes listed in Tennessee Code Annotated, Title 49, Part 5. A principal with tenure whose contract is terminated under this section shall be transferred to another professional position for which he is licensed and qualified. Nothing in this contract shall be construed to prevent the board from terminating a tenured principal from employment for cause."

Section 11 of the contract, which deals with performance standards, goals, and objectives, provides in its last sentence that "[t]hese goals and objectives may be unilaterally amended by the superintendent as needed on an annual basis, or upon transfer of the principal to another position."

The defendants contend, and the district court agreed, that Mr. Sharp's principal employment contract was merely modified, not terminated, when Sharp was reassigned as a math tutor at Halls High School. We are not persuaded that the language of the contract supports the defendants' contention.

Read in the light of TENN. CODE ANN. § 49-2-303, with which it was intended to comply, the contract employs Mr. Sharp as a principal – not as a teacher. Subject to Dr.

public employee can point to a statute as giving him a protected property interest in the job he holds. That is not the case as far as Mr. Sharp's principalship is concerned. Tennessee's Teacher Tenure Act includes school principals in the definition of "teacher," see TENN. CODE ANN. § 49-5-501(10), and provides that administrative and supervisory personnel such as principals "shall have tenure *as teachers* and not necessarily tenure in the specific type of position in which they may be employed." TENN. CODE ANN. § 49-5-501(11)(A) (emphasis supplied). The Tennessee legislature did not intend that a principal should have a statutory entitlement to his principalship. See *Coe v. Bogart*, 519 F.2d 10, 12 (6th Cir. 1975) (citing *State v. Yoakum*, 201 Tenn. 180, 297 S.W.2d 635 (1956)).

The school principal who was the plaintiff in *Coe v. Bogart* was not a party to a "principal employment contract" at the time of his reassignment. See *Coe v. Bogart*, 377 F.Supp. 310, 311 (E.D. Tenn. 1974). Had such an employment contract been in effect, it is likely that the courts would have found Mr. Coe to have a contract-based property interest in his principalship. See *Kendall v. Bd. of Educ.*, 627 F.2d 1, 4 (6th Cir. 1980), where we held that a non-tenured teacher had a protected property right in her one-year employment contract. *Cf. White v. Banks*, 614 S.W.2d 331, 334 (Tenn. 1981), where the Tennessee Supreme Court noted that

"a teacher, who also is employed as an athletic coach by a school board, has two sets of rights, e.g., (1) his position as a teacher is protected by tenure, assuming that he has acquired tenure status, and, (2) his position as a coach is protected by whatever contract he has with the board to perform coaching duties, but not by tenure."

See also *Fulks v. Watson*, 2001 WL 673573, * 6 (Tenn. Ct. App. 2001).

Applying *White* and *Kendall* here, we conclude that Mr. Sharp had a protected property interest in his position as principal by reason of his principal employment contract. The

a public official – would plant the seed of a constitutional case.' *Connick*, 461 U.S. at 149. The letter and the skit 'if released to the public, would convey no information at all other than the fact that a single employee is upset with the status quo.' *Id*. at 148."

Mr. Sharp argues, in response, that the dress code was a matter of intense public concern, as was evidenced by the parental complaints and press commentary it generated; that whether Dr. Lindsey backed up the principal and the Gibbs dress code committee was itself a matter of public interest; and that Sharp's criticism of the way the matter had been handled did not relate primarily to a private personnel issue or job-related grievance.

In practice, as this debate illustrates, application of the *Connick* test can be difficult. In the case before us, happily, the nettle is one we need not grasp. Pretermitting this particular issue, we shall assume for purposes of analysis, without so deciding, that Mr. Sharp was speaking more as a citizen on matters of public concern than as an employee on matters of personal interest. The section that follows explains why our indulgence in this assumption does not necessarily mean that Mr. Sharp carries the day on his First Amendment claim.

### 2.  *Pickering* Balancing

Once we get past the *Connick* issue, we must engage in a "balancing" exercise mandated by *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968). *Pickering* directs us to weigh the interest of the public employee in commenting as a citizen upon matters of public concern against the government's interest in the efficient provision of public services. *Id.* at 568.

In striking the balance, we must "consider whether an employee's comments meaningfully interfere with the performance of [his] duties, undermine a legitimate goal or mission of the employer, create disharmony among co-workers, impair discipline by superiors, or destroy the

relationship of loyalty and trust required of confidential employees." *Williams v. Kentucky*, 24 F.3d 1526, 1536 (6th Cir. 1994). And we must recognize that although the government bears the burden of justifying the adverse employment action, see *Rankin v. McPherson*, 483 U.S. 378, 388 (1987), the government is entitled to greater deference when regulating speech as an employer than when it attempts to regulate the speech of the public at large. See *Waters v. Churchill*, 511 U.S. 661, 673 (1994):

> "The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer. The government cannot restrict the speech of the public at large just in the name of efficiency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate." *Id.* at 675.

Mr. Sharp's interest in casting aspersions on his superiors strikes us as relatively attenuated. According to his own testimony, Mr. Sharp wrote his August 3 letter primarily to apprise the dress code committee of the situation and to thank them for their efforts in revising the code. The slaps at Dr. Lindsey and the school board were thus secondary; had the *ad hominem* material been omitted, the ostensible purpose of the letter would still have been served.

On the other side of the balance, we must consider the defendants' argument that Sharp's speech disrupted the close working relationship between superintendent and principal – a relationship on which the effective functioning of the school system depends. As superintendent, Dr. Lindsey was entitled under Tennessee law to expect the cooperation and support of the principal. See *Fleming v. Wade*, 568 S.W.2d 287, 290 (Tenn. 1978). The relationship is a highly personal one – so personal, indeed, that the superintendent employs principals in his own name under an employment contract that may not exceed the contract term of the superintendent himself. See

TENN. CODE ANN. § 49-2-303(1). "[A]nd the superintendent must necessarily be accorded considerable discretion in the employment and retention of such personnel." *Fleming*, 568 S.W.2d at 290. *Cf. Connick*, 461 U.S. at 151-152 ("When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate").

The fostering of a good working relationship between the principal and his newly-appointed boss was hardly helped, as Dr. Lindsey pointed out in his deposition, by Mr. Sharp's failure to speak with him privately before trying to put the superintendent in a bad light before the dress code committee and the teaching staff. A different superintendent might not have considered Mr. Sharp's conduct insubordinate, but Dr. Lindsey obviously did – and we cannot say that he abused his discretion in concluding that the interest of a smoothly functioning administrative team would best be served by the reassignment of Mr. Sharp. In our judgment, the interests of a tension-free superintendent/principal relationship outweighed Mr. Sharp's interest in trying to make himself look good at the expense of Dr. Lindsey and the board. See *Brandenburg*, 253 F.3d at 899 (6th Cir. 2001).

### C.  Due Process Claim

#### 1.  Protected Property Interest

Mr. Sharp contends that he had a protected property interest in his position as principal and that he was deprived of this property without the process due him under the Constitution. The defendants respond that under Tennessee law the plaintiff had no protected property interest in his principal's post. Even if he had such an interest, they go on to argue, the process accorded him was not constitutionally defective.

Property interests protected by the Constitution stem from an independent source, such as state law, and are not created by the Constitution itself. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 537 (1985) (citing *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)). Frequently a