**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JOYCE ROCK,

      Plaintiff - Appellant,

v.

DON LEVINSKI; BOARD OF
EDUCATION OF CENTRAL
CONSOLIDATED SCHOOL DISTRICT,

      Defendants - Appellees.

No. 14-2157

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. No. 1:13-CV-00652-KBM-CG)**

Timothy L. White, Valdez and White Law Firm, LLC, Albuquerque, New Mexico, for
Appellant.

Jason M. Burnette (Elizabeth L. German with him on the brief), of German & Associates,
LLC, Albuquerque, New Mexico, for Appellees.

Before **LUCERO**, **HARTZ**, and **HOLMES**, Circuit Judges.

**HARTZ**, Circuit Judge.

Plaintiff Joyce Rock was terminated from her position as principal of a school in the Central Consolidated School District (the District) after she spoke at a public meeting in opposition to a proposal by the District's administration to close her school. Rock sued the District's Board of Education and Superintendent Don Levinski (Defendants) under 42 U.S.C. § 1983, alleging that they violated the First Amendment by retaliating against her for her speech. The United States District Court for the District of New Mexico granted summary judgment in favor of Defendants, concluding that they did not violate Rock's First Amendment rights and that Levinksi was entitled to qualified immunity. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm because Rock's interest in publicly expressing her policy views did not overcome Defendants' concern that those holding high-ranking policy positions speak publicly with a single voice on policy matters.

## I.      BACKGROUND

Rock was the principal of Career Prep High School in Shiprock, New Mexico, from November 2009 until she was terminated in May 2013. Career Prep is an alternative high school for the District, serving students who are parents, have been suspended from another school for an extended period, or do not feel comfortable at other schools. Phil Kasper, the District's Director of Administration and Rock's immediate supervisor, told Rock on Monday, May 6, 2013, that the District was planning to close Career Prep at the end of the school year to save money. Under the plan, Career Prep

2

students would be enrolled at Shiprock High School unless they made other arrangements.

Two days later, Levinski and Kasper held a meeting with Career Prep staff to explain the closing. They made a presentation and then several staff members and Rock raised questions and concerns. At 6:00 p.m. that day a second meeting took place in the school cafeteria. A letter addressed to Career Prep parents, students, and staff regarding the meeting had been distributed through the students. The letter, on the District's letterhead and signed by Levinski, said that the administration was going to propose to the school board that Career Prep be closed and announced that the District would like to meet with parents to discuss the matter. According to Levinski's deposition testimony, "the purpose of the [evening] meeting [was] to listen to the community and to listen to the students and the parents." Aplt. App. at 69. Beyond disseminating the letter from Levinski's office, Rock did not have any role in organizing or publicizing the evening meeting. Although no one asked Rock to attend the meeting, Kasper and Levinski expected that she would be there. The meeting was attended by Career Prep students, parents, staff, and other community members. Rock attended and sat in the second row of chairs with the audience.

The parties dispute when Rock first spoke at the meeting. According to Rock's affidavit, she did not open the meeting as a principal or otherwise. Rock testified at her deposition that the meeting began with Kasper showing a PowerPoint presentation, and then audience members went to the podium to speak. She said that she spoke at the very

3

end of the public-comment portion of the meeting. Kasper, however, testified that Rock had a role in facilitating the meeting, she introduced herself and the participants, and she was one of the first people to speak. Levinksi testified that Rock's husband opened the meeting (presumably the public-comment portion of the meeting), and Rock was the next person to speak after her husband.

Rock stood at her chair and faced the audience while she spoke. She testified that she probably introduced herself as principal, saying that she was there in support of the students and appreciated all the community members who had spoken and their love of the school. She expressed her worry that some students would not feel comfortable enough to enroll at a large school such as Shiprock High School and that some students would not succeed at another school. At some point during the meeting, a student became disruptive and Rock calmed him down after Levinksi gestured to her. At the end of the meeting, Rock thanked Levinksi and the audience for coming to the school and said that the doors were always open to community members.

The next day, May 9, the Board of Education announced that it had identified additional funds and Career Prep would remain open. On May 13, Kasper gave Rock "a growth plan," which indicated that Rock had performed unsatisfactorily in working with administrators, supervisors, students, staff, parents, and community members. Kasper explained at his deposition that this evaluation was based on Rock's failure to support the superintendent and to speak with him privately about the school closing. The growth plan recommended that Rock "voic[e] her opposition to the superintendent's decisions

4

outside of the work place and work time," "voic[e] her opposition to district direction within the confines of her office or her supervisor's office," and "cease to use language that students cannot become successful, apart from her school." *Id.* at 71. Kasper suggested at his deposition that Rock's lack of confidence in her students' ability to succeed in other settings reflected negatively on her "belief system," *id.* at 111, and deeply disappointed Levinski. But Kasper also testified that Rock's comments at the evening meeting did not disrupt his working relationship with her, that any disruption to the District was not necessarily caused by what Rock said at the meeting, and that "the negative effect to the [D]istrict . . . would have been temporary." *Id.*

Levinski disagreed with Kasper's decision to put Rock on a growth plan. He decided that Rock's contract would not be renewed and on May 29 she was placed on administrative leave through the end of her then-pending contract. Levinski testified that "[t]he primary reason for [Rock's] termination had to do with the Wednesday night meeting." *Id.* at 62. He felt that Rock had not behaved in a "professional manner": her job was to support the District but instead she had publicly taken the position that the school should remain open. *Id.* at 61. Levinksi believed that Rock crossed a line by acting as though the District was trying to hurt the students and the school. He also found offensive Rock's suggestion that a substantial number of students would drop out rather than enroll at Shiprock High School if Career Prep was closed. The last day of Rock's contract was June 12. Shortly thereafter, she was named Principal of the Year by the New Mexico Association of Secondary School Principals.

Rock brought a First Amendment retaliation claim against Defendants under § 1983.[1] She alleged that Defendants unconstitutionally retaliated against her for speaking in opposition to the closing of Career Prep at the evening meeting. The district court granted summary judgment for Defendants, holding that (1) Rock's speech was not protected because it was made pursuant to her official duties; (2) even if Rock did not speak in her official capacity, the District's interests in efficient public service outweighed Rock's interest in the speech; and (3) Levinski was entitled to qualified immunity because he did not violate a clearly established First Amendment right. We affirm on the second ground.

## II.    DISCUSSION

We review de novo the grant of summary judgment. *See Seifert v. Unified Gov't of Wyandotte Cnty./Kansas City*, 779 F.3d 1141, 1150 (10th Cir. 2015). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[W]e view the evidence and draw reasonable inferences in the light most favorable to the nonmovant." *Seifert*, 779 F.3d at 1150 (internal quotation marks omitted).

---

[1] The parties entered a Stipulated Order dismissing Rock's claims against Kasper and claims under the New Mexico Whistleblower Protection Act, the Fourteenth Amendment, and the New Mexico Constitution.

6

Section 1983 enables a plaintiff to recover damages from a person who violated her constitutional rights while acting under color of state law. *See id.* at 1150–51. Rock's constitutional claim arises under the First Amendment. Because she was a public employee, she did not enjoy the same scope of First Amendment rights as a private citizen. *See id.* at 1151. "Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Lane v. Franks*, 134 S. Ct. 2369, 2377 (2014) (internal quotation marks omitted). Accordingly, "the First Amendment protection of a public employee's speech depends on a careful balance between the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 2374 (brackets and internal quotation marks omitted).

What we call the *Garcetti/Pickering* test, *see Garcetti v. Ceballos,* 547 U.S. 410 (2006); *Pickering v. Bd. of Educ.,* 391 U.S. 563 (1968), governs claims by public employees that they have suffered retaliation for exercising their right to speak. *See Seifert*, 779 F.3d at 1151. Under this test we ask:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

7

*Id.* (internal quotation marks omitted). "The first three elements are typically questions of law (though they can turn on disputed issues of fact), while the last two are typically questions of fact." *Id.*

On appeal the parties dispute the first and third elements, but we need address only the third, which can be paraphrased as "whether the government had an adequate justification for treating the employee differently from any other member of the public based on the government's needs as an employer." *Lane*, 134 S. Ct. at 2380 (internal quotation marks omitted). Relevant considerations include "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). The employer need not await the detrimental impact before taking action. Preemptive steps to avoid such an impact can be acceptable, and we "will generally defer to a public employer's reasonable predictions of disruption, as long as the predictions are supported by specific evidence." *Deschenie v. Bd. of Educ. of Cent. Consol. Sch. Dist. No. 22*, 473 F.3d 1271, 1279 (10th Cir. 2007) (internal quotation marks omitted).

The central issue here is whether Levinksi could discharge Rock because of his view that her speech "ha[d] a detrimental impact on close working relationships for which personal loyalty and confidence [were] necessary." *Rankin*, 483 U.S. at 388.

8

Levinksi said that he terminated Rock for her comments at the evening meeting because they were unprofessional. "[H]er job . . . , as any employee of the [D]istrict," he said, was "to support the [D]istrict." Aplt. App. at 61. In our view, Rock's public opposition to the administration's policy was a sufficient ground for her termination.

Rock was not an ordinary employee of the District. She was not a teacher, but a principal, a high-ranking member of the management team. She was the chief administrative officer of Career Prep. New Mexico law provides that "a school principal shall . . . under the general supervision of the local superintendent, assume administrative responsibility and overall instructional leadership for the public school to which [she] is assigned" and "perform other duties assigned to [her] by the local superintendent to implement the policies of the local school board." N.M. Stat. Ann. § 22-10A-18. Rock was responsible for carrying out District policy, conveying information about District policy to students and parents, and "[c]ommunicat[ing] a clear vision of excellence consistent with the mission and goals of the [District]." Aplt. App. at 51.[2]

---

[2] The job description for high school principals lists the following:

Essential Duties and Responsibilities:

◦ Enhance student, employee and program performance to guide continuous improvement.
◦ Develop and implement a school improvement plan/EPSS that supports increased student achievement.
◦ Evaluate data and services to ensure students, employees, and school district needs are being met.

Continued . . .

As the Supreme Court has explained, "The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails." *Rankin*, 483 U.S. at 390. "Where . . . an employee serves no confidential, policymaking or public contact role, the danger to the

---

   ◦   Communicate a clear vision of excellence consistent with the mission and goals of the school district.
   ◦   Select, support, evaluate, and maintain quality instructional and support personnel.
   ◦   Provide direction and support for the accomplishments of instructional, curricular, and program requirements.
   ◦   Develop leadership skills for staff members through the provision of leadership opportunities.
   ◦   Resolve problems by using effective problem-solving techniques.
   ◦   Coordinate daily operations, maintenance, and safety of the facility.
   ◦   Prepare the school budget and monitor the expenditure of funds; provide for adequate inventories of school property and the security and accountability for that property.
   ◦   Coordinate and oversee all extracurricular programs.
   ◦   Maintain high standards of student conduct and enforce discipline.
   ◦   Submit required reports and respond to administration's written and oral requests for information.
   ◦   Evaluate student progress and effectiveness of programs to determine what practices or objectives are needed to maintain or modify the program.
   ◦   Comply with all Board of Education policies, administrative regulations, Public Education Department guidelines and local, state and federal laws.
   ◦   Perform other job responsibilities as assigned.

Qualifications:

   ◦   Current PED New Mexico administrator license
   ◦   Master's Degree
   ◦   Quality improvement principles and data driven decision making
   ◦   Curriculum development and implementation

Aplt. App. at 51.

10

agency's unsuccessful functioning from that employee's private speech is minimal."
*Id.* at 390–91. But those who do have such roles are more restricted. For example, "though a private person is perfectly free to uninhibitedly and robustly criticize a state governor's legislative program, [the Supreme Court has] never suggested that the Constitution bars the governor from firing a high-ranking deputy for doing the same thing." *Waters v. Churchill*, 511 U.S. 661, 672 (1994) (plurality opinion), *see Pickering*, 391 U.S. at 570 ("[The teacher's] employment relationships with the [school board] and, to a somewhat lesser extent, with the superintendent are not the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning."); *Curtis v. Okla. City Pub. Sch. Bd. of Educ.*, 147 F.3d 1200, 1214 (10th Cir. 1998) ("Plaintiff was involved in the development and implementation of policies for the School District, and Plaintiff's job responsibilities involved significant contact with the public. Consequently, Plaintiff's burden of caution with respect to his speech was high and Defendants had a greater interest in considering his speech when making an employment decision." (citation and internal quotation marks omitted)); *Joyner v. Lancaster*, 815 F.2d 20, 24 (4th Cir. 1987) ("[Plaintiff] was a highly placed official in a para-military unit. He had only two superiors. He had an important role in the implementation of the sheriff's policies, and he was an essential link between the sheriff and the deputies whom he supervised. In those circumstances, mutual confidence and loyalty are of great importance.").

Rock's public speech did not expose corruption or other unlawful conduct, or even some secret agenda of the District. It simply expressed her opposition to the policy adopted by her superiors. And it is well established that the First Amendment does not require a government employer to tolerate such disloyalty from the upper echelons of the administration (even though we may question the wisdom of the termination). In such circumstances, the balance of interests favors the government employer.

We agree with the views expressed by the Second Circuit in granting qualified immunity to the president and provost of a university who were sued for First Amendment retaliation by a professor demoted from a deanship because of his public opposition to university policies. *See Faghri v. Univ. of Conn.*, 621 F.3d 92, 97–99 (2d Cir. 2010). "[T]he management of a public institution, such as a university," it said, "is not required to retain in a management or policymaking position a person who publicly opposes its policies." *Id.* at 97. Rather, "[s]uch an institution is entitled, for the sake of effective implementation of its policies, to have in management positions, especially high-ranking executive positions, persons who will support its policies, rather than persons who will undermine its goals by voicing public opposition to them." *Id*.

Our precedent supports this view. In *Dixon v. Kirkpatrick,* 553 F.3d 1294 (10th Cir. 2009), we observed that a government employer has an interest "in speaking in a single, consistent voice" and rejected a First Amendment retaliation claim because the employee had "frustrated the ability of [the government agency] to control and fashion its own message." *Id.* at 1308–09; *see id.* at 1308 ("'In its capacity as employer, the

12

government has two interests that come up in many contexts: the desire to avoid disruption of working relationships and the need to set out a uniform official position.'" (quoting Cass R. Sunstein, *Government Control of Information,* 74 Cal. L. Rev. 889, 919 (1986))).  Similarly, in *Deschenie*, we wrote:

> [The plaintiff's] position as Director of Indian Education and Bilingual Education also weighs heavily in favor of the [school board's] interest in restricting her speech. . . .  [N]ot only was [she] speaking as a school official [because her letter to the editor was published as signed by her in her capacity as a school administrator], but she was the school official in charge of the very program the speech concerned, making her statements even more capable of interfering with the [school board's] official position. The manner in which [she] spoke further increased the potential for disruption.  By going outside internal channels and airing her concerns publicly without district approval, [she] chose a method of expression which inherently had greater potential for disruption than other alternatives.

473 F.3d at 1281; *see also Fields v. City of Tulsa*, 753 F.3d 1000, 1015 (10th Cir. 2014) (police captain's challenge to his superior's order "would likely undermine not just his superiors' confidence in his loyalty and willingness to implement orders, but also his own authority as a commander"), *cert. denied*, 135 S. Ct. 714 (2014); *Moore v. City of Wynnewood*, 57 F.3d 924, 934–35 (10th Cir. 1995) (deputy chief's "leadership position . . . increased the chance that his statements [at a public meeting] would impact the department and would reasonably threaten his close working relations both with the ordinary patrol officers and with [the police chief]").

Other circuits have specifically addressed school principals in this context.  In *Sharp v. Lindsey*, 285 F.3d 479, 482–87 (6th Cir. 2002), the Sixth Circuit held that a county's superintendent and board of education did not violate the First Amendment

when they demoted the plaintiff, a principal, after he criticized the superintendent's handling of the school dress code. It noted "the defendants' argument that [the plaintiff's] speech disrupted the close working relationship between superintendent and principal—a relationship on which the effective functioning of the school system depends," and said that the superintendent "was entitled under [state] law to expect the cooperation and support of the principal." *Id.* at 486. Although "[a] different superintendent might not have considered [the plaintiff's] conduct insubordinate," the court could not say that the superintendent "abused his discretion in concluding that the interest of a smoothly functioning administrative team would best be served by the reassignment of [the plaintiff]." *Id.*

And in *Vargas-Harrison v. Racine Unified School District*, 272 F.3d 964, 967–68 (7th Cir. 2001), the Seventh Circuit affirmed the demotion of a principal after she spoke in opposition to the proposal supported by her superiors on how to use funds from a special state program. The court relied on the principal's having a policy-making position. It applied the circuit's general rule that "the First Amendment does not prohibit the discharge of a policy-making employee when that individual has engaged in speech on a matter of public concern in a manner that is critical of superiors or their stated policies." *Id.* at 971 (footnote omitted). "[W]ith respect to these employees," it explained, "the *Pickering* analysis regularly will result in a determination that the government employer's need for political allegiance from its policymaking employee outweighs the employee's freedom of expression to such a degree that it obviates

*Pickering* balancing," so there would be no need for further "fact-specific analysis." *Id.* (internal quotation marks omitted). The court said that "the policy-maker analysis applies to situations where a policy-making employee engages in speech critical of his superiors' work-related policies" and applied the analysis in that case because the principal's "stance placed her in square opposition to the stated goals and policies of her superiors." *Id.* at 973–74. The principal "owed her superiors a duty of loyalty with respect to [the] subject" of the funding proposal, and her speech in opposition to the proposal was not protected by the First Amendment. *Id.*

Rock appears to add a new argument in her reply brief, contending that Defendants could not reasonably base Rock's termination on her failure to support District policy because the District had not made a final policy decision to close Career Prep. We need not address this argument because it comes too late. *See United States v. Bennett*, 329 F.3d 769, 778 n.7 (10th Cir. 2003) (argument not raised in opening brief is waived). In any event, Levinksi had made it known that the administration planned to propose to the school board that Career Prep be closed, and Levinksi could reasonably view Rock's speech in opposition to this decision as a failure to support District policy.

Finally, Rock argues that Defendants' allegations of disruption are contradicted by Kasper's decision to put Rock on a growth plan rather than terminate her and by Kasper's testimony suggesting that Rock's speech did not disrupt their working relationship or the business of the District. Yet even viewing this evidence in the light most favorable to Rock, her speech still could put in doubt the loyalty and confidence necessary to her

15

working relationship with Levinksi, and Rock does not challenge Levinksi's explanation of his motives for terminating her. Although Kasper was Rock's direct supervisor and she did not have any day-to-day interactions with Levinksi, she was nonetheless a member of Levinksi's executive team. A superintendent should be able to expect loyalty and support, at least in public, from a high-ranking employee like a principal who is responsible for implementing his policies. *See Sharp*, 285 F.3d at 485–87; *Vargas-Harrison*, 272 F.3d at 974.

For the foregoing reasons, the termination of Rock did not violate her First Amendment rights.

## III. CONCLUSION

We AFFIRM the district court's grant of summary judgment to Defendants.