**BOARD OF TRUSTEES SABIS
INTERNATIONAL SCHOOL,**
Plaintiff,

v.

**Betty D. MONTGOMERY,
et al., Defendants.**

No. 02–CV–411.

United States District Court,
S.D. Ohio,
Eastern Division.

June 14, 2002.

James R. Greene, III, James R. Greene III & Associates, Dayton, OH, for Plaintiff.

David Sherman Timms, Ohio Attorney General, Roger Francis Carroll, Ohio Attorney General, Columbus, OH, Carl Joseph Stich, Jr., White Getgey & Meyer, Michael Wesley Hawkins, Dinsmore & Shohl, Cincinnati, OH, for Defendants.

## *OPINION AND ORDER*

MARBLEY, District Judge.

## I. INTRODUCTION

This matter is before the Court on the Plaintiff's Motion for a Preliminary Injunction. Beginning on May 22, 2002, and ending on May 24, 2002, the Court held a hearing on the Plaintiff's motion. By agreement of the parties, the hearing was merged with a trial on the merits. Also pending is the Defendant's Motion to Dismiss, in which the Defendant challenges, *inter alia*, this Court's jurisdiction over this matter.

Based on the following analysis, the Court **GRANTS** the Defendant's Motion to Dismiss the Plaintiff's claims, and **DENIES** the Plaintiff's Motion for an Injunction.

## II. FACTS AND PROCEDURAL HISTORY

### A. Factual History

In June 1997, the Ohio General Assembly enacted legislation, currently codified as Ohio Revised Code Chapter 3314, that allowed for the creation of community schools.[1] Pursuant to Ohio Rev.Code § 3314.01(B):

> A community school created under this chapter is a public school, independent of any school district, and is part of the state's program of education. A community school may sue and be sued, acquire facilities as needed, contract for any services necessary for the operation of the school, and enter into contracts with a sponsor pursuant to this chapter. The governing authority of a community school may carry out any act and ensure the performance of any function that is in compliance with the [Ohio law], and the contract entered into under this chapter establishing the school.

To create a new start-up school, a group of individuals must present a proposal to one of six public entities, which, if it accepts the proposal, will become the sponsor of the school. OHIO REV.CODE § 3314.02(C). The sponsor then enters into a contract with the school's governing authority. Ohio Rev.Code § 3314.03 requires a provision in the contract between the sponsor and the governing authority that establishes procedures for resolving disputes or differences of opinion between the sponsor and the governing authority. OHIO REV.CODE § 3314.03(18). According to the Defendant, Dr. Susan Zelman, the Ohio Superintendent of Public Instruction, currently, ninety-two community schools operate in Ohio. The State Board of Education sponsors seventy-four of these schools.

Pursuant to Ohio Rev.Code § 3314.03, the State Board of Education entered into a contract ("Sponsorship Contract") with the Plaintiff, the Board of Trustees of the SABIS® International School of Cincinnati ("the Board"), whereby the State Board of Education agreed to sponsor the community school established by the Board, the governing authority of the school. The

---

1. Community schools are often referred to as "charter schools" in other states.

State Board of Education drafted the contract. The Sponsorship Contract was signed by Defendant Zelman on behalf of the State Board of Education, and by Defendant Carol Kerlakian, the former Board Chair, along with Susan Moore and Tracey Lowe, on behalf of the governing authority of the SABIS International School. Pursuant to the statutory requirement that the Sponsorship Contract set forth the manner in which disputes between the sponsor and the governing authority will be resolved, the Sponsorship Contract contains the following provision:

> Any dispute involving [SABIS] and the SPONSOR regarding this contract, shall be resolved in the following manner:
>
> The parties shall mutually agree upon a fair and impartial arbitrator in an effort to resolve the dispute and reach an amicable agreement. If the parties are unable to agree upon an arbitrator, the Superintendent of Public Instruction shall appoint one;
>
> If an agreement cannot be reached within sixty (60) days from the date the arbitrator is appointed, the arbitrator shall render a decision that shall be binding upon both parties and such decision shall be final and nonappealable.

In addition to the Sponsorship Contract, the Board entered into a separate contract ("Service Provider Agreement") with Cincinnati Education Management, LLC ("CEM," "Management Company," or "Service Provider"),[2] whereby CEM agreed to manage the day-to-day operations of the community school. The Service Provider Agreement was signed by Defendant Carol Kerlakian on behalf of SABIS, in her capacity as the Chair of the Board, and by Udo Schulz on behalf of CEM, in his capacity as its manager. The Plaintiff states that Ms. Kerlakian negotiated and signed all other contractual

agreements between the Board and CEM and its affiliates. In particular, Ms. Kerlakian signed a $600,000 promissory note on behalf of the Board, and signed a lease agreement, pursuant to which the Board paid the Management Company approximately $98,000 per month for use of the school building.

In September of 1999, the Board consisted of three members—Ms. Kerlakian, a Caucasian woman, Susan Moore, also Caucasian, and Tracey Lowe, an African–American woman. In or around October of 1999, Ms. Moore left her position on the Board to become Sabis' director. Ms. Moore was replaced by Andrea Carter, an African American. Subsequently, the Board grew to include five members, all of whom were African American other than Ms. Kerlakian.

In or around August 2001, Ms. Kerlakian was removed from her position on the Board by the remaining Board members. The Plaintiff contends that this removal was due to certain alleged conflicts of interests that affected Ms. Kerlakian's decision to contract with CEM, and her subsequent relationship with the Management Company. Specifically, Ms. Kerlakian's uncle founded the SABIS Corporation, and another relative is currently the President of the corporation. The Plaintiff claims that Ms. Kerlakian could not serve on the board in an objective capacity, as she explicitly told members of the Board that she could not do anything to hurt members of her family, including those who worked for the Management Company.

On December 6, 2001, the Board terminated the Service Provider Agreement with CEM, effective upon the close of the 2001–2002 school year. As a result of that termination, the working relationship between CEM and the Board has disintegrated to the point that the Board deter-

---

**2.** CEM is a subsidiary of the SABIS Corporation, the corporate body that designed the curriculum of the SABIS International School, and for whom the school is named. For the sake of clarity, the Court shall refer to the management company as CEM, rather than SABIS, though the names were used interchangeably during trial.

mined that it could no longer perform its role as the governing authority of the school.

On January 17, 2001, Mr. Steve Burigana, the Executive Director of the Office of Community Schools, visited the SABIS International School. Mr. Burigana testified that he was interested in visiting the school in an effort to help resolve the issues between the Board and the Management Company so that the school might continue to operate in its current form. During his visit to the school, Mr. Burigana met, separately, with teachers, parents, representatives from the Management Company, and the Board. According to Mr. Burigana, the parents and teachers with whom he met expressed concern over their understanding that the school is to close at the end of the current school year. He also stated that, based on his meeting with the representatives from the Management Company, Mr. Burigana got the impression that the problems between CEM and the Board arose from disagreements over how to draw the line between the Board's involvement with the school, and the Board's micro-management of the school.

During his meeting with the Board, the Board members stated that there was no possibility of mediating their problems with the Management Company. They declared that they wanted to terminate their relationship with CEM and the SABIS Corporation, and find a new method of operating the school. They also indicated that they were having difficulties obtaining important financial information from the Management Company.[3] Mr. Burigana indicated that he would attempt to obtain the necessary financial information from the Management Company on behalf of the Board. Ultimately, however, Mr. Burigana was unable to get that information from CEM.[4]

## B. Procedural History

On April 25, 2002, the Plaintiff filed a Complaint with this Court. The Complaint names as defendants Betty D. Montgomery, the Attorney General of Ohio, Susan Zelman, the Ohio Superintendent of Public Instruction, James Petro, the State Auditor, and Carol Kerlakian, the former Chair of the Plaintiff Board. On April 26, 2002, the Plaintiff filed a motion seeking to amend its Complaint to specify that the action is brought against the Defendants in their official and individual capacities. The Complaint alleges the following claims against the Defendants: (1) violation of 42 U.S.C. § 1983 based on an infringement of the Plaintiff's rights to equal protection and due process under the Fourteenth Amendment to the United States Constitution; (2) violation of 42 U.S.C. § 1981; (3) violation of Ohio's Pattern of Corrupt Activities Act, Ohio Rev.Code § 2923.32; and (4) fraud or fraudulent inducement and misrepresentation.[5] These claims were

---

3. Pursuant to the Service Provider Agreement, the management company retained control of all of the school's financial records.

4. Apparently, Mr. Burigana did receive a summary of the SABIS International School budget from the Management Company. He did not forward that information to the Board because he determined that the summary did not include the detailed transactional information that the Board needed.

5. Although the Court has deduced that these are the claims asserted based on the text of the Plaintiff's Complaint, the Complaint actually sets forth the following claims: (1) engaging in a pattern of corrupt activity in violation of Ohio Rev.Code § 2923.32; (2) fraud and misrepresentation; (3) violation of the Fourteenth Amendment Equal Protection clause; and (4) fraudulent inducement and violation of 42 U.S.C. § 1983. The Plaintiff also passingly mentions 42 U.S.C. §§ 1984–1988 and 2000(d), but fails to specify the basis upon which claims brought pursuant to those provisions might be pursued.

based, in part, on the fact that, despite the inclusion of a binding arbitration provision in the Sponsorship Contract, the state now claims that it cannot be subject to binding arbitration because it cannot waive its sovereign immunity. More generally, the claims are based on the failure of Defendants Petro, Montgomery, and Zelman to take certain action to protect the Plaintiff from the allegedly harmful Service Provider Agreement entered into by the Board, and signed by Defendant Kerlakian on its behalf. The Plaintiff seeks: (1) an injunction that (a) requires Defendants Montgomery, Petro, and Zelman to cease all unlawful activity, (b) declares the arbitration provision in the Sponsorship Contract valid and binding, (c) requires Defendant Montgomery to enforce Ohio Rev.Code §§ 3314.11, 3314.12, and 3314.03(A)(18), and (d) requires Defendant Petro to audit the community school and provide all audit information to the Plaintiff; (2) an injunction preventing Defendants Petro, Montgomery, and Zelman from violating their statutory duties arising out of the Sponsorship Contract; (3) an injunction prohibiting Defendants Petro, Montgomery, and Zelman from continuing to deprive the Plaintiff of its rights to equal protection of the law and due process of law; and (4) an injunction ordering that any and all contracts arising out of Defendant Kerlakian's conflicts of interest be dissolved.

On April 25, 2002, the Plaintiff also filed a Motion for a Temporary Restraining Order and Preliminary Injunction, seeking to enjoin the Defendants from interfering with the Plaintiff's efforts to reconstitute the community school. That day, pursuant to Local Rule 65.1, a conference was held on the Plaintiff's Motion for a Temporary Restraining Order. After listening to the parties' arguments at that conference, the

Court denied the Plaintiff's Motion. The Court also set the Plaintiff's Motion for a Preliminary Injunction for hearing on May 22, 2002. The parties agreed that the hearing on the motion would be merged with a trial on the merits.

At the 65.1 conference, the Defendants raised the question of whether this Court has jurisdiction to hear this matter. Thus, the Court requested that the parties file briefs addressing that issue prior to the hearing set for May 22, 2002. The Court also granted the parties permission to file other dispositive motions prior to the hearing. On May 3, 2002, the Plaintiff filed a Motion in Support of this Court's Jurisdiction, and Defendants Petro, Montgomery, and Zelman filed Motions to Dismiss, seeking to dismiss this case for lack of jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1).[6] In the alternative, Defendants Petro, Montgomery, and Zelman argued that the case should be dismissed pursuant to Fed. R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. In addition, Defendant Petro sought summary judgment pursuant to Fed.R.Civ.P. 56. Defendant Kerlakian also filed a Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6).

The Court held the trial on this matter beginning on May 22, 2002, and ending on May 24, 2002. Prior to the start of trial, the Plaintiff **VOLUNTARILY DISMISSED** Defendant Petro from this action. Mr. Petro was dismissed in light of a letter delivered to the Board from the State Auditor's office, which indicated that the State had attempted to complete an audit of the SABIS International School, but was unable to do so because certain relevant financial information was missing. The letter also indicated that the Board's failure to provide the necessary informa-

---

**6.** The Defendants individually filed their motions, but each motion set forth essentially the same arguments.

tion to the Auditor's office within ninety days of the date of the letter would result in legal action.

After the close of the Plaintiff's evidence, the remaining Defendants renewed their motions to dismiss the Plaintiff's claims against them. Defendant Montgomery also made a motion pursuant to Fed.R.Civ.P. 52(c) for a judgment on partial findings. In addition, Defendant Zelman moved for an involuntary dismissal pursuant to Fed.R.Civ.P. 41(b). Subsequently, the Court **DISMISSED** Defendant Kerlakian as a party, based on the Court's determination that the Plaintiff sought no relief from her. The Court also **DISMISSED** Defendant Montgomery as a party, based on the Court's conclusion that the Plaintiff failed to present any evidence to support a finding that Attorney General Montgomery was in any way liable to the Plaintiff Board of Trustees. Thus, Ms. Zelman is the only Defendant against whom claims are currently pending.

## III. STANDARD OF REVIEW

### A. Rule 12(b)(1)

■ Before determining whether a plaintiff has stated a claim upon which relief may be granted, the Court must first decide whether it has subject matter jurisdiction. *City of Heath, Ohio v. Ashland Oil, Inc.*, 834 F.Supp. 971, 975 (S.D.Ohio 1993) (citing *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir.1990)).

■ "[W]here subject matter jurisdiction is challenged under Rule 12(b)(1), ... the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Rogers v. Stratton Indus.*, 798 F.2d 913, 915 (6th Cir.1986). In the context of a Rule 12(b)(1) motion, "[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spald-*

*ing*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). A Rule 12(b)(1) motion to dismiss will be granted only if, taking as true all facts alleged by the plaintiff, the court is without subject matter jurisdiction to hear the claim.

### B. Rule 12(b)(6)

■ In considering a Rule 12(b)(6) motion to dismiss, this Court is limited to evaluating whether a plaintiff's complaint sets forth allegations sufficient to make out the elements of a cause of action. *Windsor v. The Tennessean*, 719 F.2d 155, 158 (6th Cir.1983). Under limited circumstances, however, a court may rely on documents outside the pleadings, if those documents "simply [fill] in the contours and details of the plaintiff's complaint, and [add] nothing new," without converting the motion to dismiss into a motion for summary judgment. *Yeary v. Goodwill Indus.-Knoxville, Inc.*, 107 F.3d 443, 445 (6th Cir.1997).

■ A complaint should not be dismissed under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 724 (6th Cir.1996). This Court must "construe the complaint liberally in the plaintiff's favor and accept as true all factual allegations and permissible inferences therein." *Lillard*, 76 F.3d at 724 (quoting *Gazette v. City of Pontiac*, 41 F.3d 1061, 1064 (6th Cir.1994)). While the complaint need not specify every detail of a plaintiff's claim, it must give the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Gazette*, 41 F.3d at 1064. While liberal, this standard of review does require more than the bare assertion of legal conclusions. *In re DeLo-*

*rean Motor Co.,* 991 F.2d 1236, 1240 (6th Cir.1993) (citation omitted). A complaint must contain either direct or inferential allegations with respect to all the material elements necessary to sustain a recovery under some viable legal theory. *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 437 (6th Cir.1988).

## IV. ANALYSIS

### A. Court's Jurisdiction

■ Defendant Zelman contends that this Court lacks jurisdiction over the Plaintiff's claims brought against her in her official capacity because such jurisdiction is barred by the Eleventh Amendment to the United State Constitution.[7]

■ The Eleventh Amendment to the United States Constitution states that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. Although the text of the amendment seems to prohibit only suits against states brought by citizens of other states, it has long been held that "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (citations omitted). Courts have also recognized that the Eleventh Amendment bars suits against not only the state itself, but also suits against state officers when the state is the real party in interest, such as when the action is one to recover money damages that will be paid out of the state's treasury. *Id.* (citing *Ford Motor Co. v. Department of Treasury,* 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945)).

■ The Eleventh Amendment does not, however, present an absolute bar to suits against states and state officers in federal court. In particular, the Eleventh Amendment will not bar a suit against the state or its officers when: (1) application of *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), and its progeny is appropriate; (2) the state has consented to be sued; or (3) Congress has properly abrogated the states' immunity. *Nelson v. Miller,* 170 F.3d 641, 646 (6th Cir.1999). The Plaintiff argues that the Eleventh Amendment does not bar its suit against Defendant Zelman either because *Ex Parte Young* applies or because the state consented to be sued when it drafted the Sponsorship Contract with the binding arbitration clause.

### 1. Ex Parte Young

■ In *Young,* the Supreme Court held that an individual may bring suit against state officers in federal court when the individual seeks prospective injunctive relief to prevent the officers' violation of federal law. *Edelman,* 415 U.S. at 664, 94 S.Ct. 1347 (distinguishing a suit seeking retroactive relief from suits that fall within the *Young* exception to Eleventh Amendment immunity). Here, the Plaintiff seeks

---

7. Defendant Zelman also asserts that the Plaintiff's state law claims brought against her in her individual capacity must be dismissed because an official sued in her individual capacity cannot be subject to an injunction ordering her to act in a particular way as a state officer. *See Kentucky v. Graham,* 473 U.S. 159, 165–66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (discussing the distinctions between personal capacity and official capacity lawsuits).

The Plaintiff has not attempted to dispute this statement of law. The Court notes that despite the Plaintiff's claim that it is pursuing this lawsuit against the Defendant in both her official and individual capacities, the only relief sought is injunctive relief that would affect the Defendant in her official capacity. Therefore, the Plaintiff's state law claims brought against Defendant Zelman in her individual capacity are **DISMISSED.**

only prospective injunctive relief. Thus, under this well-established rule of law, this Court has jurisdiction to hear the Plaintiff's claims brought against Defendant Zelman for her alleged violation of federal law.

▮▮▮ *Young*, however, does not extend to actions brought against state officers for their alleged violations of state law.[8] To the contrary, the Eleventh Amendment prohibits federal courts from enjoining state officials from acting in violation of state law. *Freeman v. Michigan Dept. of State*, 808 F.2d 1174, 1179 (6th Cir.1987) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)). Thus, for this Court to have jurisdiction over the Plaintiff's state law claims brought against Defendant Zelman, the Court must be able to conclude that another exception to Eleventh Amendment immunity applies under these circumstances. Specifically, the Plaintiff has argued that Eleventh Amendment immunity does not bar its claims based on state law because the State consented to be sued in federal court.

Therefore, in light of *Ex Parte Young*, the Court determines that it has jurisdiction to hear the Plaintiff's federal claims, and next considers whether it has jurisdiction to hear the Plaintiff's state law claims because the State consented to be sued in federal court.

### 2. Consent

The Plaintiff claims that the State consented to be sued in federal court when it drafted the Sponsorship Contract to include a binding arbitration clause.[9]

▮▮▮ A state may waive its Eleventh Amendment immunity by making a "clear declaration" of its intent to do so. *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 676, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999) (citing *Great Northern Life Ins. Co. v. Read*, 322 U.S. 47, 54, 64 S.Ct. 873, 88 L.Ed. 1121 (1944)). The state's consent to suit must be "unequivocally expressed." *Pennhurst State Sch. and Hosp.*, 465 U.S. at 99, 104 S.Ct. 900 (citing *Edelman*, 415 U.S. at 673, 94 S.Ct. 1347). In other words, a waiver of Eleventh Amendment immunity will be found where indicated by express language, or where the text of a state statute so overwhelmingly indicates the intent to waive sovereign immunity that the language leaves no room for any other reasonable construction. *Allinder v. State of Ohio*, 808 F.2d 1180, 1184 (6th Cir.1987) (citations omitted). "Thus, a State does not consent to suit in federal court merely by consenting to suit in the courts of its own creation.... Nor does it consent to suit in federal court merely by stating its intention to 'sue and be sued,' ... or even by authorizing suits against it 'in any court of competent jurisdiction.'" *College Sav. Bank*, 527 U.S. at 676, 119 S.Ct. 2219 (citations omitted).

Recently, the Supreme Court held that a State waives its Eleventh Amendment immunity when it removes a suit to federal

---

**8.** It is worth noting that, even though the Court has jurisdiction over the Plaintiff's federal claims brought against Defendant Zelman based on *Young*, that is an insufficient basis for finding that the Court also has jurisdiction over the Plaintiff's state law claims because the judge-made doctrine of pendent jurisdiction does not override the strictures of the Eleventh Amendment. *Freeman v. Michigan Dept. of State*, 808 F.2d 1174, 1180 (6th Cir.1987) (citation omitted); *see Edwards v.*

*Commonwealth of Kentucky Revenue Cabinet, Div. of Compliance and Taxpayer Assistance*, 22 Fed. Appx. 392, 393, 2001 WL 1299263, at *1 (6th Cir.2001) (stating that "neither supplemental jurisdiction nor any other basis for jurisdiction overrides Eleventh Amendment immunity") (citation omitted).

**9.** The State of Ohio has expressly consented to be sued in Ohio's Court of Common Claims. OHIO REV.CODE § 2743.02(A)(1).

court in which it is named as a defendant. *Lapides v. Bd. of Regents of the Univ. Sys. of Georgia,* — U.S. ——, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002). The Court reiterated the holding of *College Sav. Bank,* and distinguished waivers by litigation conduct, which constitute "clear declarations" of a State's intent to waive Eleventh Amendment immunity, from the constructive waivers rejected in *College Sav. Bank.* In drawing this distinction, the Court reasoned:

> [A]n interpretation of the Eleventh Amendment that finds waiver in the litigation context rests upon the Amendment's presumed recognition of the judicial need to avoid inconsistency, anomaly, and unfairness, and not upon a State's actual preference or desire, which might, after all, favor selective use of 'immunity' to achieve litigation advantages.

*Id.* at 1644 (citing *Wisconsin Dept. of Corr. v. Schacht,* 524 U.S. 381, 393, 118 S.Ct. 2047, 141 L.Ed.2d 364 (1998) (Kennedy, J., concurring)).

 This Court finds that the State's insertion of a binding arbitration clause into the Sponsorship Contract waives the State's Eleventh Amendment immunity, and constitutes consent to be sued in federal court. Similar to the act of removal, which is litigation conduct, the insertion of the binding arbitration clause into the contract constitutes *pre*-litigation conduct, or action undertaken in anticipation of future disputes that might result in litigation. As the Supreme Court stated with respect to certain litigation conduct, an interpretation of the Eleventh Amendment that would allow the State to engage in the *pre*-litigation act of drafting a binding arbitration clause into a contract without waiving sovereign immunity would rest upon the State's mere "preference or desire." Such an interpretation of the Eleventh Amendment would allow the State selectively to

hide behind the cloak of sovereign immunity when doing so would serve its litigation objectives. In other words, an interpretation of the Eleventh Amendment that allows the State selectively to waive sovereign immunity encourages forum shopping by the State, and fails to produce consistent and fair results, which is precisely the opposite of what the Supreme Court mandated in *Lapides.* Therefore, the Court concludes that the State's pre-litigation act of inserting a binding arbitration provision into the contract constitutes a waiver of the State's Eleventh Amendment immunity.

 Furthermore, if the State takes the position that, generally, it cannot be subject to binding arbitration because of its sovereign immunity, then, logically, the State's drafting of a clause that subjects the State to binding arbitration represents a clear declaration of its intent to waive its immunity. How else could the State draft a clause that, under normal circumstances, could not be binding upon it? Under well-established contractual principles, ambiguous terms of a contract are construed against the drafter. *Diversified Energy, Inc. v. Tennessee Valley Authority,* 223 F.3d 328, 339 (6th Cir.2000) (citing *Hills Materials Co. v. Rice,* 982 F.2d 514, 516–17 (Fed.Cir.1992)). Here, the State drafted the contract. Thus, any ambiguity that might arise from the insertion of the binding arbitration provision must be construed against the State. The Court cannot simply conclude that, by drafting the binding arbitration clause, the State intended to leave open the issue of how conflicts between the contracting parties would be resolved. For the State to have done so would have been to have violated Ohio law. *See* OHIO REV.CODE § 3314.03(18) (requiring that all sponsorship contracts include a provision setting forth procedures for resolving disputes be-

tween the sponsor and the governing authority of the school). Rather, the Court must presume that by drafting the arbitration provision, the State intended to be bound thereby.

Accordingly, the Court finds that it has jurisdiction to hear the Plaintiff's state law claims brought against Defendant Zelman because the State consented to be sued in federal court when it inserted a binding arbitration provision into the Sponsorship Contract. The Court **DENIES** Defendant Zelman's Motion to Dismiss the Plaintiff's state law claims for lack of jurisdiction.

## B. 42 U.S.C. § 1983

■■■■ The Plaintiff has brought claims against Defendant Zelman pursuant to 42 U.S.C. § 1983. Section 1983 reads, in relevant part:

Every person who, under color of any statute, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983. To succeed on a claim for a violation of § 1983, the plaintiff must show that (1) a person (2) acting under color of law (3) deprived him of his rights secured by the United States Constitution or its laws. *Berger v. City of Mayfield Heights,* 265 F.3d 399, 405 (6th Cir.2001). A state official, sued in her official capacity for prospective injunctive relief, is a person acting under color of law for purposes of § 1983. *Wolfel v. Morris,* 972 F.2d 712, 719 (6th Cir.1992) (citing *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 73–74, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)). Thus, the Court need only determine whether Ms. Zelman deprived the Plaintiff

of its rights secured by the United States Constitution or its laws.

### 1. Equal Protection

■■■■ "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (quoting *Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982)). To assure that similarly situated people are treated alike, government classifications based on race, alienage, or national origin are subject to strict scrutiny, and may be sustained only if they are narrowly tailored to serve a compelling government interest. *Id.* at 440, 105 S.Ct. 3249.

■■■■ The Plaintiff Board contends that Ms. Zelman and her office discriminated against it on the basis of race. The Board members claim that when Ms. Kerlakian, a Caucasian woman, was the Board chair, the State provided significant assistance to the Board. They claim, however, that when Ms. Kerlakian was removed from the Board, and the Board became exclusively African American, the Board was unable to communicate with, or obtain assistance from, the State. In particular, the Board claims that it wanted the State's assistance regarding the promissory note and the lease agreement entered into with the Management Company, but that it was unable to get any such assistance. The Board also claims that the State treated non-minority boards from other schools differently. The Board relies on the deposition of Matthew DeTemple, the Chief Counsel for the State Board of Education, during which he allegedly testified that, despite the State's current claim that it

cannot be subject to binding arbitration with the Board because it cannot waive sovereign immunity, the State has engaged in binding arbitration with other school boards.[10]

The Court finds that the Plaintiff has failed to demonstrate that Defendant Zelman violated the Board's Fourteenth Amendment right to Equal Protection. First, while the Plaintiff presented some evidence that the State was more involved with the Board when Ms. Kerlakian was the Board chair, the State also provided a logical explanation for its decreased involvement. Specifically, Mr. Burigana testified that the State Board of Education, as a Sponsor, typically provides more assistance to governing authorities when they are beginning to run a community school. That is, the Sponsor's role is to enable the school to exist by providing oversight and technical support at the beginning, and then stepping back to allow the governing authority to run the school with flexibility and creativity. The Plaintiff failed to present any evidence to contradict Mr. Burigana's testimony. Thus, the State provided a logical, non-discriminatory reason for its diminished involvement after Ms. Kerlakian had been removed from the Board, which was uncontroverted by the Plaintiff.[11]

Second, the Plaintiff presented no evidence that either Ms. Zelman or anyone from her office violated any governmental duties by refusing to intervene in the school's financial agreements with the Management Company. The Board entered into two independent contracts—one with the State, and one with CEM. The Board did not, and could not, thereby impose a duty on State officers to assist with the service provider contract. Thus, in light of the fact that it is the Sponsor's role to enable the school to exist and function on its own, the Plaintiff has not demonstrated that the Defendant discriminated against the Board on the basis of race by failing to provide the Board assistance with respect to the financial agreements entered into with the Management Company.

Third, the Board's attempt to bolster its claim of discriminatory treatment by its reliance on Mr. DeTemple's deposition testimony must fail because the Board's recapitulation of that testimony is fatally inaccurate. Mr. DeTemple testified that he was aware that a binding arbitration clause was included in the Sponsorship Agreement, and that three predominantly African American community schools, including SABIS, had made demands for binding arbitration. At no point, however, did Mr. DeTemple indicate that the State Board of Education had treated this Board differently than non-minority entities by engaging in binding arbitration with non-minority school boards, but denying such an opportunity to the Plaintiff. A careful review of the deposition transcript reveals the following relevant testimony:

Q [by Plaintiff's Counsel]: Do you have an understanding of the Collective Bargaining Act?

A [by Mr. DeTemple]: I do.

---

10. Mr. DeTemple stated that a school board is analogous to the Plaintiff Board of Trustees.

11. It is worth noting that the Court has presumed that the State, in fact, became less involved with the Board after Ms. Kerlakian was removed from her position. No one with first hand knowledge regarding the kind and degree of assistance actually provided to the Board by the State testified to that fact. Rather, various Board members based their testimony regarding the State's diminished involvement on what was reported to them by Ms. Kerlakian regarding her contact with the State. Ms. Kerlakian, however, did not testify that she actually had as much contact with the state as was alleged by the other Board members.

Q: Do you have an understanding that they have an arbitration agreement?

A: I understand that certain public entities that are subject to Chapter 4117 can have a binding arbitration clause in their Collective Bargaining Agreement.

Q: And that exists with the State of Ohio?

A: I don't know whether that would apply to the State of Ohio.

Q: All right. Do you understand that the State of Ohio can use 4117 with state employees that have unions?

A: I understand, yes, that, to an extent. My experience was representing Boards of Education so my familiarity with Chapter 4117 is as it applies to Public Boards of Education.

Q: Doesn't change your understanding that there are arbitration clauses that exist with state entities under 4117, correct?

. . . . .

A: I don't have personal knowledge of whether there are arbitration clauses that would apply to like a bargaining unit with—between an exclusive representative and the State of Ohio. I do know that there are Collective Bargaining Agreements between school boards and exclusive representatives that contain binding arbitration clauses.

Q: Similar to the one we have?

A: Yes, similar to the one in the contract. Yes.

Q: And in that situation, has there been binding arbitration?

A: You're asking about my experience with school boards?

Q: No, just saying has there been binding arbitration, to your knowledge?

A: Well, to my knowledge, based on my work with school boards, yes, I am aware that there were binding arbitrations involving school boards in Ohio.

Q: And would it be a fair and accurate statement that the governing authority is, in effect, the school board for the charter school?

A: It's certainly analogous to that, yes.

Mr. DeTemple's testimony does not indicate that the State Board of Education has engaged in binding arbitration with school boards as the Plaintiff would have the Court believe. To the contrary, the discussion regarding binding arbitration deals with Mr. DeTemple's representation of public school boards, and their dealings with collective bargaining agreements pursuant to Ohio Revised Code Chapter 4117, Public Employees' Collective Bargaining. Mr. DeTemple did not testify that in his experience as counsel for the State Board of Ohio that this entity has engaged in binding arbitration with school boards pursuant to a provision similar to the binding arbitration provision in the Sponsorship Contract. At no point during his deposition did Mr. DeTemple indicate that he had ever participated in binding arbitration while serving as counsel for the State Board of Ohio. Thus, the Plaintiff's assertion that Mr. DeTemple's deposition provides support for its claim that it is treated differently from similarly situated non-minority governing authorities or school boards must fail.

The Plaintiff has failed to demonstrate that the Defendant treated similarly situated school boards differently than she treated the Plaintiff. Therefore, the Court **GRANTS** the Defendant's Motion to Dismiss the Plaintiff's claim brought pursuant to 42 U.S.C. § 1983 for violation of its Fourteenth Amendment right to equal protection, and **DENIES** the Plaintiff's Motion for an Injunction on that basis.

### 2. Due Process

The Plaintiff alleges that it has been denied of its "due process rights as it pertains to [its] property rights in contract, legal interest and duties. to the School and providing an educational oppor-

tunity to students who primarily are African American citizens."

■ The Due Process Clause of the Fourteenth Amendment provides that "no State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV. For a procedural due process claim under the Fourteenth Amendment to succeed, a plaintiff must establish the existence of a liberty or property interest of which he was deprived by the defendant. *Bd. of Curators of Univ. of Missouri v. Horowitz,* 435 U.S. 78, 82, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978). For a constitutionally protected property interest to exist, "a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

■ The Plaintiff claims, first, that Defendant Zelman denied it of its right to due process by depriving it of its property right in contract. Specifically, the Board alleges that Defendant Zelman, through her failure to assist the Board, deprived it of its property right in the Sponsorship Agreement. The Court finds that this claim must fail. "Property interests protected by the Constitution stem from an independent source, such as state law, and are not created by the Constitution itself." *Sharp v. Lindsey,* 285 F.3d 479, 487 (6th Cir.2002) (citing *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 537, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)). A contract may serve as the independent source that protects property interests. *Leary v. Daeschner,* 228 F.3d 729, 741–42 (6th Cir. 2000) (concluding that a collective bargaining agreement created a property interest for teachers in their continued employment in their positions); *see Sharp,* 285 F.3d at 487 (finding that a principal had a

protected property interest in his position as a principal by virtue of his employment contract). While a contract may create a property interest, one does not have a property interest, *per se,* in a contract. Thus, the Plaintiff's assertion that it was improperly denied its property right in contract must fail, as the Plaintiff has no such property right.

■ Second, the Plaintiff claims that it was denied its Fourteenth Amendment right to due process because Defendant Zelman deprived it of its legal interest in providing an education for African American students. The Court finds that this claim also must fail. Ohio students have a property interest in their education. *Goss v. Lopez,* 419 U.S. 565, 573–74, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (holding that Ohio statutes that provide for free public education for all Ohio residents between the ages of five and twenty-one and that dictate compulsory attendance policies indicate that Ohio residents have a right to education that cannot be infringed without due process). That property interest, however, belongs to the students, not to the board of trustees that establishes and governs a community school. Thus, while a student of the community school may have a due process claim based on the deprivation of his property interest in his education, the Plaintiff Board cannot assert a claim based on the alleged denial of the students' property interest.

■ Third, the Plaintiff claims that it has been deprived of its property interest in its position as the Board, which arises by virtue of the Sponsorship Contract. As stated above, a contract may serve as the independent source that protects property interests. *Leary,* 228 F.3d at 741–42. In *Leary,* for example, the court found that the collective bargaining agreement created a property interest in continued employment by virtue of a provision that

provided that teachers could not be transferred except upon a showing of good cause and extenuating circumstances. *Leary*, 228 F.3d at 742. The court compared that provision in the collective bargaining agreement to other contractual provisions that were found to create a property interest in continued employment, most of which stated that the employee could be dismissed only for cause. *Id.* (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538–39, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), *Johnston-Taylor v. Gannon*, 907 F.2d 1577, 1581 (6th Cir.1990), and *Ramsey v. Bd. of Educ.*, 844 F.2d 1268, 1272 (6th Cir.1988)).

Like the contracts in *Leary* and the cases cited therein, the Sponsorship Contract contains a provision that indicates that the Sponsor may choose to terminate the contract prior to its expiration date of June 30, 2004 only upon a showing of good cause. Specifically, the provision states that the State Board of Education may choose to terminate the contract for any of the following reasons:

1. The GOVERNING AUTHORITY'S failure to meet student performance requirements stated in this contract;

2. The GOVERNING AUTHORITY'S failure to meet generally accepted standards of fiscal management;

3. The GOVERNING AUTHORITY has violated any provisions of this contract or applicable state or federal law; or

4. Other good cause.

Based on this provision, the Court finds that the Plaintiff Board, as the governing authority of the community school, has a property interest in continuing in its position as such. The Court now turns to the question of whether Defendant Zelman deprived the Plaintiff of this property interest without due process of law.

 The Plaintiff claims that Defendant Zelman deprived it of its property interest in continuing to operate as the governing authority of the community school by virtue of her "failure to properly, [sic] monitor, audit and report on [her] findings to Plaintiff." The Court understands the Plaintiff's Complaint to allege that, by virtue of Defendant Zelman's alleged failure to monitor, audit, and report her findings regarding CEM's management of the school to the Plaintiff Board, the Plaintiff has lost its ability to act as a functioning governing authority of the school. Ms. Zelman asserts that she could not have deprived the Plaintiff of its property interest because she has no statutory obligation to "monitor, audit, or report on [her] findings."

The Court finds that Defendant Zelman did not deprive the Plaintiff of its property interest in continuing as the governing authority of the community school. First, Ms. Zelman is correct that she is under no statutory or contractual duty to monitor, audit, and report on the school's Service Provider to the Board of Trustees. Although the Plaintiff has relied on Ohio Rev.Code §§ 3314.08, 3314.11, and 3314.12 as establishing such a duty, neither these provisions, nor any other provision in Chapter 3314 of the Ohio Revised Code, require the superintendent of public instruction to monitor, audit, or report on a community school's service provider. Ohio Rev.Code § 3314.08, which deals with annual enrollment reports by school districts and community schools, and the calculation of payments to community schools, imposes no reporting requirement on the superintendent of public instruction. To the contrary, that provision requires school districts and governing authorities of community schools to report information to the state. Ohio Rev.Code § 3314.11 imposes no reporting or monitoring requirement on the state superintendent. Rather, that provision calls for the creation of a state office of school options which is to provide

advice and services to community schools. Finally, Ohio Rev.Code § 3314.12 imposes no duty on the superintendent of public instruction to monitor or report on a school's service provider. That provision simply requires the legislative office of education to create an annual composite of community schools that is to contain basic information about all community schools in the state, and is to be presented to the speaker of the house, the president of the senate, and the governor, not to the community schools themselves.

▇ Second, and more significantly, the Board simply has not been deprived of its interest in continuing to operate as the School's governing authority by virtue of anything that Ms. Zelman did or did not do. To the contrary, by the Board's own admission, the difficulties that it has had functioning as the governing authority of the school arise from the Board's own voluntary termination of the Service Provider Agreement. Ms. Zelman played no role in the Board's decision to terminate that contract. Furthermore, neither Ms. Zelman nor anyone from her office encouraged the Board to enter into the Service Provider Agreement in the first place. The Board made that decision independently, as it is permitted to do under Ohio law, and it cannot now fault the State.

Therefore, the Court **GRANTS** the Defendant's Motion to Dismiss the Plaintiff's claim brought pursuant to 42 U.S.C. § 1983 for violation of its Fourteenth Amendment right to due process, and **DENIES** the Plaintiff's Motion for an Injunction on that basis.

### C. 42 U.S.C. § 1981

▇ Section 1981 provides:

(a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 U.S.C. § 1981. The elements of a *prima facie* case under § 1981 are the same as those for a claim brought under Title VII. *Johnson v. University of Cincinnati,* 215 F.3d 561, n. 5 (6th Cir.2000) (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). Adapting the elements of a Title VII case to this context, the plaintiff must demonstrate: (1) that it is a member of a protected class; (2) that it attempted to contract, or sought the benefit of law enjoyed by white citizens; (3) that it was qualified to do so; and (4) that the contract or benefit was still available after the plaintiff was turned away. *Reese v. City of Southfield,* 162 F.3d 1162, 1998 WL 552841 at *5 (6th Cir.1998) (citing *Chauhan v. M. Alfieri Co., Inc.,* 897 F.2d 123, 127 (3d Cir.1990)).

▇ The Plaintiff alleges that Defendant Zelman violated 42 U.S.C. § 1981. In particular, the Board claims that Defendant Zelman's agent, Steve Burigana, the Executive Director of the Office of Community Schools, violated § 1981 by interfering with the Plaintiff's Service Provider Agreement by attempting to force a modification of that contract, rather than allowing the Plaintiff to continue with the dissolution of the contract. Specifically, the Board points to Mr. Burigana's attendance at the January 17, 2002 meeting at the school, and a letter that he wrote encouraging the Board to mediate its problems

with the Management Company. Furthermore, as discussed above with respect to the Equal Protection claim, the Plaintiff has attempted to augment its claim by alleging that Mr. DeTemple testified that Defendant Zelman refused to adhere to the binding arbitration provision of their contract, though she adheres to such provisions with respect to other school boards.

The Court concludes that the Plaintiff has failed to prove the necessary elements for a successful § 1981 claim. While the Plaintiff is a member of a protected class, as all Board members are African–American, the Plaintiff has failed to demonstrate that it attempted to contract with the Defendant, but was denied a contract, or that it sought the benefit of law enjoyed by white citizens but was denied that benefit. First, the Plaintiff attempted to contract with the State, and it successfully did so. In addition, the Plaintiff sought to enforce its right to terminate a contract, and the State did not prevent it from doing so. While the Plaintiff alleges that Mr. Burigana interfered with this right, in point of fact, Mr. Burigana did not even begin working for the State in the Office of Community Schools until after the Board had already effectively terminated its Service Provider Agreement. The fact that Mr. Burigana subsequently encouraged the Board to enter into mediation is irrelevant.

Second, the Plaintiff has failed to allege that any benefits of law that it was denied are benefits enjoyed by white citizens. Assuming, *arguendo*, that Ms. Zelman, through her agent, Mr. Burigana, attempted to interfere with the Plaintiff's right to terminate its contract, the Plaintiff has presented no evidence that Ms. Zelman does not act similarly with respect to community schools run by, or attended by, white citizens. That is, other than making bare allegations of race discrimination, the Board has presented no evidence that either Ms. Zelman or Mr. Burigana do not encourage all governing authorities to mediate with their service providers rather than terminating their service provider contracts. Thus, while the Plaintiff alleges that it is denied a benefit of law, the Board has failed to demonstrate that it has been denied a benefit of law that is enjoyed by white citizens.

Third, with respect to the Plaintiff's argument that Mr. DeTemple conceded that white citizens enjoy the benefit of binding arbitration provisions while the Plaintiff was denied that benefit, for the reasons stated above with respect to the Plaintiff's equal protection claim, that argument must fail.

Therefore, the Court **GRANTS** Defendant Zelman's Motion to Dismiss the Plaintiff's claim brought pursuant to 42 U.S.C. § 1981, and **DENIES** the Plaintiff's Motion for an Injunction pursuant to this claim.

### D. Other federal claims

In the second paragraph of its Complaint, the Plaintiff states that this case is "a suit in equity authorized by 42 U.S.C. §§ 1983–1988 and 2000d." Other than this brief statement, the Plaintiff no where else elaborates on the assertion that this claim is brought pursuant to 42 U.S.C. §§ 1985–1987 [12] and 2000d. After the Court's care-

---

12. Sections one and two of 42 U.S.C. § 1984 were declared unconstitutional in *Civil Rights Cases, In re*, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883). Sections three and four of that statute were repealed on June 25, 1948. Therefore, the Court presumes that the Plaintiff did not intend to include a claim based upon that statute as a part of the Complaint.

In addition, while the Plaintiff did not elaborate upon the claim based on 42 U.S.C. § 1988, the Court presumes that the Plaintiff intended only to reserve the right to seek attorney's fees should the Plaintiff succeed on the merits of the claim brought pursuant to 42 U.S.C. §§ 1981 or 1983.

ful review of the Complaint and the evidence presented during trial, the basis for that assertion remains unclear. In response to the Defendant's motion to dismiss those claims, the Plaintiff failed to provide a basis upon which this Court might find that the Complaint sets forth facts that support a claim under those provisions of federal law. Furthermore, the Plaintiff failed to elaborate on the basis for these claims during the trial of this matter.

Therefore, the Court **GRANTS** the Defendant's Motion to Dismiss the Plaintiff's claims brought pursuant to 42 U.S.C. §§ 1985–1987 and 2000d, and **DENIES** the Plaintiff's Motion for an Injunction pursuant to those claims.

### E. Ohio Pattern of Corrupt Activities Act

 The Plaintiff has alleged a claim against Ms. Zelman for violation of the Ohio Pattern of Corrupt Activities Act ("PCA"), Ohio Rev.Code § 2923.31, *et seq.,* which is patterned after the Federal Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.* Ohio courts have found that the elements for a PCA violation are the same as those for a RICO claim. *See Universal Coach, Inc. v. New York City Transit Auth., Inc.,* 90 Ohio App.3d 284, 629 N.E.2d 28, 32 (1993). Thus, a properly pleaded PCA claim must allege: "(1) conduct of the defendant which involves the commission of two or more of specifically prohibited state or federal criminal offenses; (2) the prohibited criminal conduct of the defendant constitutes a pattern of corrupt activity; and (3) the defendant has participated in the affairs of an enterprise or has acquired and maintained an interest in or control of an enterprise." *Id.* (citing *Sedima S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)). Under the PCA, a "pattern of corrupt activity" consists of "two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event." Ohio Rev.Code § 2923.31(E). The PCA defines an "enterprise" as "any individual, sole proprietorship, partnership, limited partnership, corporation ... or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity. 'Enterprise' includes illicit as well as licit enterprises." Ohio Rev.Code § 2923.31(C).

 The Court finds that the Plaintiff has failed to demonstrate that Defendant Zelman violated the PCA. First, the Board has failed to prove that Ms. Zelman committed two or more predicate criminal acts. While the Board alleges that Ms. Zelman committed common law fraud, the Plaintiff has failed to allege any criminal conduct on the part of the Defendant. In addition, assuming, *arguendo,* that Ms. Zelman did commit some criminal act, the Plaintiff has neither demonstrated that this criminal activity was committed as part of a pattern of corrupt activity, nor has the Plaintiff shown that the allegedly criminal actions were taken in connection to any particular enterprise.

Therefore, the Court **GRANTS** the Defendant's Motion to Dismiss the Plaintiff's claim brought pursuant to the Ohio Pattern of Corrupt Practices Act, Ohio Rev. Code § 2323.31, and **DENIES** the Plaintiff's Motion for an Injunction based on the Defendant's alleged violation of this statute.

### F. Fraud or Fraudulent Inducement and Misrepresentation

 Under Ohio law, a claim of common law fraud requires a plaintiff to plead: " '(a) a representation or, where there is a duty to disclose, concealment of a fact, (b)

which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.'" *Cohen v. Lamko, Inc.,* 10 Ohio St.3d 167, 462 N.E.2d 407, 409 (1984) (quoting *Friedland v. Lipman,* 68 Ohio App.2d 255, 429 N.E.2d 456 (1980)).

The Plaintiff claims that Defendant Zelman committed fraud by inserting the binding arbitration provision into the Sponsorship Contract when she knew that the State could not be bound by such a provision. The Plaintiff alleges that such a fraudulent act was material to the transaction at hand because the Board was induced to enter into the Sponsorship Contract with the State based, in part, on that provision. In particular, the Board claims that the binding arbitration provision was appealing because it indicated that any disputes between the governing authority and the sponsor would be resolved relatively efficiently and cost-effectively. The Board also alleges that, in light of the fact that it was the State that drafted the Sponsorship Contract, it was justified in relying on that provision when it signed the contract. Finally, the Board alleges that it has suffered two fundamental injuries: (1) the Board's inability to function as a governing authority based on the disintegration of its relationship with the Management Company; and (2) the threat of litigation against the Board by the State if the Board is unable to obtain certain financial data from the Management Company necessary to complete the State's audit. Thus, the Board contends that the Defendant's fraudulent act caused the injuries suffered because the arbitration clause induced the Board to contract with the State, but then the Defendant violated her other contractual duties by failing to prevent the harms suffered.

The Court finds that the Plaintiff's claim brought against Ms. Zelman for fraud or fraudulent inducement must fail. The Court recognizes that Ms. Zelman, or a representative from her office, inserted the binding arbitration provision into the contract, presumably with the knowledge that the State could not be bound by such a provision. The Court also presumes that the State must have recognized why such a dispute resolution provision would be appealing to a governing authority. Indeed, many individuals logically prefer the efficiency and cost-effectiveness of arbitration to what can often become expensive and protracted litigation. Nonetheless, the Court finds that two key factors prevent the Plaintiff from succeeding on this claim.

First, the Plaintiff has failed to demonstrate that the binding arbitration clause was, in fact, a motivating factor for the Board's decision to contract with the State as the community school sponsor. While Plaintiff's counsel argued that the Board found the clause to be appealing for the reasons discussed above, no Board member testified that the arbitration provision actually played any role in their decision to contract with the State. The Court does not doubt that the arbitration clause added to the appeal of the contract, but the Court also finds that other factors impacted the Board's decision to contract with the State. In light of the length of the Sponsorship Agreement, and the numerous facets of the relationship between the governing authority and the sponsor set forth therein, the Court is hard pressed to believe that the Board would not have contracted with the State even in the absence of a binding arbitration provision.

Second, the Plaintiff has failed to demonstrate that the Defendant's fraudulent act proximately caused an injury that can

be redressed by this Court. In fact, neither of the injuries alleged by the Plaintiff relates in any way to the Defendant's allegedly fraudulent act. The fact that the Board is no longer able to function as the governing authority arises from the Board's dispute with the Management Company, not from anything that Ms. Zelman did or failed to do. Ms. Zelman neither participated in the Board's decision to contract with the Management Company (nor in the decision to terminate that contract), nor was she under any duty to do so. Likewise, the fact that the Board may have legal action instituted against it by the State arises from the Board's inability to communicate with the Management Company, not from anything that Ms. Zelman did or failed to do. Neither Ms. Zelman nor any other State official is legally obligated to assist the Board in obtaining financial information about its own school from the Management Company with whom the Board entered into an independent contract. Furthermore, both of these harms arise completely independently from the State's insertion of the binding arbitration clause in the Sponsorship Agreement. Thus, while the Plaintiff has alleged certain injuries, the Plaintiff has failed to establish a nexus between those injuries and the Defendant's fraudulent act.

Therefore, the Court **GRANTS** the Defendant's Motion to Dismiss the Plaintiff's claims of fraud, fraudulent inducement, and misrepresentation, and **DENIES** the Plaintiff's Motion for an Injunction based on this claim.

## V. CONCLUSION

Based on the foregoing analysis, the Court **GRANTS** the Defendant's Motion to Dismiss the Plaintiff's claims against her, and **DENIES** the Plaintiff's Motion for an Injunction.

**IT IS SO ORDERED.**