**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 5, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

MOSTAFA MOHD KHONDAKER,

    Defendant-Appellant.

No. 06-5172
(D.C. No. 05-CR-134-CVE)
(N.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **BALDOCK**, and **GORSUCH**, Circuit Judges.

Mostafa Mohd Khondaker appeals his conviction on four counts of

possession of a controlled substance with intent to distribute in violation of 21

U.S.C. § 841(a)(1) and one count of possession of a firearm in furtherance of a

drug-trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A). He focuses his

appeal on the sufficiency of the evidence presented by the government to support

his conviction on each of the five counts. He also challenges his sentence with an

argument since foreclosed by Supreme Court precedent. Exercising jurisdiction

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. This court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 32.1.

pursuant to 28 U.S.C. § 1291, we hold that the evidence was sufficient for a reasonable jury to find Khondaker guilty beyond a reasonable doubt on all counts and therefore **AFFIRM**.

I

A

Officers from the Tulsa Police Department ("TPD") first began to suspect criminal activity at the Seven Days Food Corner convenience store when a confidential informant ("CI") indicated to TPD Officer Mike Helton that crack cocaine was available for purchase at the store. According to the CI, the drugs could be purchased from either a father or a son who were employed there. Based on this tip, Helton organized a "controlled buy" in which he planned to send the CI to purchase narcotics at the store under the supervision of the Special Investigations Division ("SID") of TPD. Thereafter, in late July 2005, the CI successfully executed the plan, carrying out the first of two controlled buys. According to the CI, "a younger Middle-Eastern male," someone other than Khondaker,[1] was working behind the store counter, and agreed to sell a small amount of crack cocaine. To compile additional evidentiary support for a potential search warrant, TPD later sent the same CI to attempt another controlled buy. The results of the second purchase were identical to the first—the CI purchased more crack cocaine from the same "younger Middle-Eastern male."

---

[1] Khondaker is in his late fifties and is of Bangladeshi descent.

On July 29, 2005, Helton obtained a search warrant for the store from a state court. Helton's partner, Officer Nicholas DeBruin, organized a SID team to execute the warrant on Thursday, August 4, 2005. The officers' operation began at approximately 2:00 p.m. that day, when the SID team began to monitor the store. From the vantage point of an unmarked car, they first noticed that Khondaker, rather than a "younger Middle-Eastern male," was the sole employee working behind the store counter that day.

Notwithstanding their awareness that the clerk working at the store was not the same individual who had previously sold drugs to the CI, the officers continued to monitor the store. The team intended to observe all of the customer traffic entering and exiting the store that afternoon to determine whether any customers purchased a controlled substance while inside. They were unable, however, to position themselves for a direct view into the store, and thus did not observe any illegal transactions take place. Nevertheless, they noted that of the six to eight customers entering the store that afternoon, none exited the building with shopping bags or any obvious purchases.[2] In the officers' judgment, these customers likely left the store without any merchandise because they had purchased only drugs.

---

[2] Two other officers who monitored the store on previous dates also observed customer traffic entering and exiting the store, and each testified that they saw no purchases made from the store's regular inventory.

After approximately five hours of monitoring the store, the officers prepared to execute the search warrant.[3] Around 7:30 p.m., Sergeant Sam McCullough, a plainclothes officer, entered the store to secure it for the impending raid. While inside, McCullough observed a man enter the store and walk up to the counter where Khondaker was standing, apparently to make a purchase. Khondaker asked the man what he needed and the man responded with an answer inaudible to McCullough. Then, just as Khondaker was reaching under the counter, the remainder of the SID team pulled into the parking lot. Observing this arrival, Khondaker immediately said to the customer, "Uh-oh, it's Five-O,"[4] to which the customer responded, "Hold that thought; I'll be back later." The customer then promptly left the store before the police entered.

---

[3] The surveillance team was not at the store continuously during the afternoon. DeBruin testified that each time the team observed what they thought might be a suspicious purchase, they followed the purchaser's vehicle. This practice caused significant time gaps in their surveillance of the store. According to DeBruin, the team planned to follow each customer until they could have a marked patrol car pull that individual over for a traffic violation that would support a search for drugs. Of the six to eight people the officers followed, none committed any traffic infractions, and the officers were therefore unable to determine whether any of them had purchased drugs from Khondaker.

[4] According to McCullough, "Five-O" is a commonly used slang phrase in north Tulsa that means "police." The slang term was likely initially popularized by the 1970's hit television series "Hawaii Five-O" in which Jack Lord portrayed the head of an elite state police unit responsible for investigating suspected international secret agents, organized crime, and assassins. However, the term may also have originated with the popular use of police interceptor vehicles having 5.0 liter engines.

Upon exiting their vehicles, the officers knocked on the store's glass door and announced that they had a warrant. They then entered the store with their weapons drawn and sought to detain the building's two occupants: Khondaker and a deliveryman for a local distributor of convenience store merchandise. DeBruin immediately told Khondaker to put his hands up. Although Khondaker, who primarily speaks Bengali, appeared to understand the command, he did not immediately comply with it. He instead hesitated and raised his hands repeatedly up and down between the level of the counter, approximately at his waist, and his chest. In response, Officer First, among the first officers inside the store, climbed behind the counter to where Khondaker was standing and handcuffed him. First then escorted Khondaker from behind the counter—a space of less than two and one-half feet wide—and discovered two handguns in plain view under the counter, directly in front of where Khondaker had been standing. First seized the firearms, a .38 caliber revolver and a .38 caliber semiautomatic pistol. He noted that the guns were both loaded and ready to fire.[5] Near the guns, First also discovered a box of .38 caliber bullets, a bullet carrier, and an extra magazine of ammunition for the semiautomatic weapon.

---

[5] First testified that the semiautomatic weapon was not only loaded, but also "chamber loaded." He explained to the jury that a semiautomatic weapon is chamber loaded when "there is a bullet in the chamber ready to be fired as soon as the trigger is pulled," rather than merely a round in the weapon's magazine.

Once the officers secured the interior of the store, they began a search of the premises. According to the CI, drugs were located behind the counter near the register, and so the officers focused on that area first. There, they found a substantial amount of controlled substances within easy reach of the spot where Khondaker stood, including: (1) 44.38 grams of cocaine base (commonly known as "crack cocaine"), (2) 16.46 grams of cocaine powder, (3) 7.24 grams of methamphetamine, (4) 1.07 grams of marijuana, and (5) 77 tablets of MDMA (commonly known as "Ecstasy").[6] All of the drugs were hidden either below the counter or next to the cash register in an assortment of cigar and cigarette boxes, and most of the drugs were packaged in small quantities. Near the drugs and also under the counter, the officers uncovered $2,359 in cash denominated in small bills, a loaded 12-gauge shotgun,[7] a bulletproof vest, binoculars, and drug paraphernalia. That paraphernalia, some of which was on open display, included

_____

[6] Officers also found 2,124 tablets of pseudoephedrine in the area behind where Khondaker was standing. DeBruin testified that, based on his expertise, he believed that these tablets were intended to be sold for use in the manufacture of methamphetamine. Khondaker, however, was not charged in relation to the pseudoephedrine discovered at the store.

[7] DeBruin testified that the handle of the shotgun protruded from under the counter and that it was located approximately four feet from where Khondaker had been standing when the officers arrived at the store.

small plastic bags, glass pipes,[8] scouring pads,[9] rolling papers, single- and double-edged razor blades, digital scales, and a large quantity of baking soda.[10]  In searching the remainder of the premises, officers also noted some unusual features of the store's interior.  They observed a large quantity of out-dated merchandise on the shelves, a thick layer of dust on items in the store's inventory, and a number of inventory boxes faded by the sun.  According to one officer, only the beer, candy bars, and ice cream had recently been restocked.

While other officers proceeded with the search, Officer David Wamsley advised Khondaker of his <u>Miranda</u> rights and placed him under arrest.  According to Wamsley, Khondaker appeared to understand his rights as well as what the officers were saying to him.  Wamsley then questioned Khondaker about his knowledge of the items found in the store, including the guns and drugs.  Khondaker admitted knowing where the two handguns and pseudoephedrine were located, but said he was unaware of any illegal drugs in the store.

**B**

---

[8] McCullough testified that the glass pipes recovered from the scene are commonly used to inhale crack cocaine.

[9] According to McCullough, drug users utilize scouring pads as filters to hold crack cocaine in place while it is being consumed in the end of glass pipes.

[10] Baking soda, or sodium bicarbonate, is a principal ingredient used in the process of converting powdered cocaine into crack cocaine.  <u>See</u> <u>Kimbrough v. United States</u>, 128 S. Ct. 558, 556 (2007) (citations omitted).  Both the baking soda and the boxes of small plastic bags were located in areas not accessible to customers.

On September 8, 2005, a federal grand jury returned a five-count indictment against Khondaker, alleging that he knowingly possessed, with the intent to distribute, crack cocaine, cocaine, MDMA, and methamphetamine in violation of 21 U.S.C. § 841(a)(1), and that he knowingly possessed three firearms in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A).[11] Khondaker pleaded not guilty to the indictment and his case proceeded to trial in late November 2005.

During a three-day jury trial, the government introduced the testimony of several officers present at the store when the search warrant was executed.[12] The government also called Corporal Harold Wells, a TPD narcotics expert present during the search, to the stand. Wells testified that an individual possessing the amount of drugs recovered at the Seven Days Food Corner would not have left the drugs in the custody of an individual who was not involved in the distribution ring. Such an individual, according to Wells, would attempt to maintain tight control over the drugs in his possession, particularly given their high monetary value and their significance to that individual's income.

For his part, Khondaker called two witnesses in his defense: Muhammad Sohail, the deliveryman present at the store when the search warrant was

---

[11] No other store employees, including the "younger Middle-Eastern male" who had previously sold crack cocaine to the CI, were indicted in connection with the raid.

[12] Officers DeBruin, First, Wamsley, and McCullough testified.

executed, and Rasel Khondaker ("Rasel"), Khondaker's son.  Sohail told the jury that he was at the convenience store on the evening of August 4, 2005, to deliver a limited amount of merchandise.  As a part of the delivery, he gave Khondaker an invoice for which he expected immediate payment.

Rasel took the witness stand next.  He explained that there was a large amount of cash at the store that evening because the Khondaker family usually paid cash for merchandise deliveries.  He stated that approximately $400 to $500 of the $2,359 recovered from under the counter was on hand to pay for Sohail's delivery, and that an additional $1,500 was to pay for another merchandise delivery expected either that evening or the following day.  Rasel also testified that his brother Sohel Khondaker ("Sohel"), Khondaker's other son and the primary owner of the store, was originally scheduled to replace Khondaker as the store clerk at 7:00 p.m. on August 4, but that he did not arrive before the police executed the warrant.  On cross-examination and after admitting knowledge of the two handguns recovered from the store, Rasel then explained that the store had been robbed at gunpoint the year before Khondaker was arrested.

At the close of the government's case in chief and again at the close of all the evidence, Khondaker moved for a judgment of acquittal on the four counts of possession with intent to distribute.  See Fed. R. Crim. P. 29.  He argued that, as a matter of law, there was insufficient evidence for a jury to find that he had the intent to distribute the drugs recovered at the store.  Finding "substantial evidence

-9-

from which a reasonable jury could infer that [Khondaker] possessed with the intent to distribute the narcotics" identified in the indictment, the district court denied his motions.

Khondaker's defense to the jury was based largely on the argument that he was the wrong person for the government to put on trial for these particular drugs. As a mere employee of the store, he was simply in the wrong place at the wrong time. Had he not been at the convenience store when the officers executed the search warrant, he never would have been arrested and charged. Moreover, according to Khondaker, the government never put forth any direct evidence that he was involved in any specific drug sales. Neither the CI, nor any of the officers who testified, ever observed Khondaker take part in a drug transaction.

Unpersuaded by these arguments, the jury found Khondaker guilty on all five counts, and the district court later sentenced Khondaker to 97 months' imprisonment on the four drug counts and 60 months' imprisonment on the firearms count, with the sentences to run consecutively. Khondaker now timely appeals both his jury conviction and his resulting sentence.

## II

Khondaker primarily contends on appeal that the evidence adduced at trial was insufficient to convict him of any of the five counts charged. "We review sufficiency of the evidence claims de novo, asking only whether, taking the evidence—both direct and circumstantial, together with the reasonable inferences

-10-

to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find [defendant] guilty beyond a reasonable doubt."[13] United States v. Allen, 235 F.3d 482, 492 (10th Cir. 2000) (quotations omitted). In reviewing the evidence in this light, we do not inquire into the jury's credibility determinations or its conclusions regarding the weight of the evidence. Id. Moreover, the evidence presented "need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt." United States v. Bowen, 437 F.3d 1009, 1014 (10th Cir. 2006) (quotations omitted). It need only reasonably support the jury's finding that the defendant is guilty of the crimes charged beyond a reasonable doubt. Id.

## A

We begin by reviewing the evidence adduced in support of the four counts of possession of a controlled substance with intent to distribute. On this score, the government bore the burden of proving that Khondaker: "(1) possessed the controlled substance; (2) knew he possessed the controlled substance; and (3)

---

[13] Although Khondaker did not move for a judgment of acquittal with respect to the firearms count of the indictment, his failure does not in practice affect our standard of review with respect to the sufficiency of the evidence on that count. When reviewing a claim of insufficient evidence that was not properly raised at trial, we technically review the claim for plain error. United States v. Cox, 929 F.2d 1511, 1514 (10th Cir. 1991). Nevertheless, because "a conviction in the absence of sufficient evidence of guilt is plainly an error, clearly prejudiced the defendant, and almost always creates manifest injustice," United States v. Goode, 483 F.3d 676, 681 n.1 (10th Cir. 2007), the two standards are functionally equivalent, Cox, 929 F.2d at 1514.

intended to distribute or dispense the controlled substance." United States v. McKissick, 204 F.3d 1282, 1291 (10th Cir. 2000); see 21 U.S.C. § 841(a)(1). According to Khondaker, the evidence adduced at trial was insufficient to support any of the three elements. We cannot agree. Although the jurors were required to draw several inferences from the evidence presented, the evidence was sufficient—when considered in combination—for a reasonable jury to find Khondaker guilty beyond a reasonable doubt on each of the four drug counts.

**1**

As to the possession element, Khondaker contends that the government failed to prove that he had either actual or constructive possession of the drugs recovered. Specifically, he argues that because other employees worked at the convenience store, the jury could not reasonably infer that he, rather than another employee, possessed the drugs.

Possession of a controlled substance may be either actual or constructive. United States v. Reece, 86 F.3d 994, 996 (10th Cir. 1996). Actual possession of an item exists when a person has direct physical control over that item. United States v. Jameson, 478 F.3d 1204, 1209 (10th Cir. 2007). Constructive possession exists when a person "knowingly holds the power and ability to exercise dominion and control over it." United States v. Lopez, 372 F.3d 1207, 1211 (10th Cir. 2004) (citations omitted). Dominion, control, and knowledge may all generally be inferred when the defendant has exclusive possession of the premises

-12-

where the item is located. Bowen, 437 F.3d at 1014 (citation omitted). When contraband may be attributed to more than one person, however, as in a case of joint occupancy of a premises, the government bears a higher burden of proof. United States v. Michel, 446 F.3d 1122, 1128 (10th Cir. 2006). It must show "some nexus, link, or other connection between the defendant and the contraband." Reece, 86 F.3d at 996. That nexus cannot be based on proximity alone, and requires either direct or circumstantial evidence that the defendant had knowledge of, and access to, the contraband. Jameson, 478 F.3d at 1209-10.

Although the government failed to present evidence that the drugs were in Khondaker's actual possession, it did present circumstantial evidence cumulatively sufficient to show that Khondaker constructively possessed them. The vast majority of the drugs discovered were located in extremely close proximity to Khondaker's post, either directly below the cash register or concealed in cigarette boxes above the counter. Other testimony showed that although Khondaker was not the only employee who worked at the store, he had the ability to exercise control over the drugs as he was the sole employee serving customers on the day he was arrested. In addition, Khondaker reached under the counter, where the drugs were later located, immediately before the raid occurred. This action tends to show Khondaker's ability to access the drugs, provides an inference of his knowledge of their presence, and proves his ability to exercise control over them. From these facts, the jury could have inferred a link between

-13-

Khondaker and the drugs seized sufficient to find that Khondaker had constructive possession of them.

**2**

A jury could also have reasonably concluded that Khondaker knowingly possessed the drugs. First, DeBruin testified that the CI initially told him that drugs could be purchased from either a father or son employed at the store, and the jury could have reasonably inferred that the CI's description of a "father" was actually a reference to Khondaker. Further, as an employee that worked at the store regularly, including on the day of his arrest, Khondaker had a substantial amount of time to be exposed to the items under the counter. As Officer First noted, the area behind the counter was extremely small, such that only one individual could reasonably fit there. Khondaker was thus often alone behind the counter near where the drugs were eventually discovered, and the jury could have reasonably inferred that he was aware and had knowledge of the items that were later recovered.

Next, McCullough testified that he saw Khondaker reaching under the counter in the moments before the uniformed SID team entered the store. Khondaker was also extremely reluctant to put his hands up and instead repeatedly appeared to put his hands below the counter level when officers first sought to detain him. Both of these actions give rise to an inference that Khondaker knew about the contraband below the counter. Finally, the jury also

heard Wells testify that a drug dealer would normally not entrust a substantial amount of drugs to someone not involved in the distribution ring. Coupled with the circumstantial testimony presented by the other officers, this testimony provided the jury with a sufficient basis upon which it could conclude that Khondaker knowingly possessed the drugs recovered from the store.

**3**

As for the intent to distribute element, Khondaker asserts that the government failed to introduce direct evidence that he was involved in any specific drugs sales. He points to the following gaps in the government's direct proof of his intent to distribute: (1) The CI made the controlled purchases from a store employee other than Khondaker; (2) No eyewitnesses testified that Khondaker sold them drugs; and (3) No officers testified that they observed Khondaker make any specific drug sales. Although our review of the record reveals that Khondaker is correct in his characterization of the government's lack of direct evidence, we cannot agree that these gaps have any effect on Khondaker's conviction. It is not the evidence that the government <u>failed</u> to introduce that governs our inquiry; rather, it is the evidence that <u>was</u> introduced, direct or circumstantial, that we must consider. Reviewing that evidence on the record before us, as well as the reasonable inferences derived therefrom, we conclude that a reasonable jury could have found that Khondaker intended to distribute the drugs recovered at the convenience store.

-15-

In Allen, we recognized four factors that will often support a conclusion that a defendant possessing drugs does so with the intent to distribute them: "(1) the amount of the drugs; (2) the way they are packaged; (3) the presence of cash; and (4) the presence of firearms." 235 F.3d at 492. We have also noted a fifth relevant factor: The presence of drug paraphernalia in close proximity to drugs. See, e.g., United States v. Verners, 53 F.3d 291, 294 (10th Cir. 1995). In this case, the government put forth evidence as to each of these five factors.

First, officers found a large quantity of drugs at the Seven Days Food Corner. They discovered 44.38 grams of cocaine base, 16.46 grams of cocaine powder, 7.24 grams of methamphetamine, and 77 tablets of MDMA. These quantities, coupled with the variety of controlled substances recovered, gave the jury a substantial basis for concluding that the drugs were for retail distribution, rather than personal use. See United States v. Pulido-Jacobo, 377 F.3d 1124, 1131 (10th Cir. 2004) ("[A] jury may infer intent to distribute from the possession of large quantities of drugs."); see also United States v. McIntyre, 997 F.2d 687, 708 (10th Cir. 1993).

Second, Wells testified that many of the drugs found under the counter or on top of it were packaged for resale. He stated that some of the crack-cocaine rocks and MDMA tablets recovered were individually packaged inside small plastic bags located in cigarette boxes, and that the amount found inside each bag was consistent with a quantity that would normally be sold to an individual

-16-

customer. He also testified as to the presence of additional plastic bags, each of approximately two square inches, that are frequently used by drug dealers for packaging or repackaging drugs for distribution.

Third, over $2,300 in cash was stored inside a cigar box underneath the cash register and near the vast majority of the drugs recovered. See Verners, 53 F.3d at 294 (reasoning that the presence of "large amounts of cash" in close proximity to drugs, drug paraphernalia, and firearms provides an inference of intent to distribute). That currency was mostly in small bills, including ones, fives, tens, and twenties; denominations that give rise to an inference that the currency represented proceeds from the retail sale of drugs.[14] See, e.g., United States v. Lauder, 409 F.3d 1254, 1260 (10th Cir. 2005).

Finally, all of the drugs were discovered within several feet of three firearms and a substantial amount of drug paraphernalia frequently used in the manufacture, distribution, and consumption of drugs. These "tools of the drug trade," most of which were located behind the counter where Khondaker was working, included rolling papers, razor blades, digital scales, glass pipes, scouring pads, baking soda, a large quantity of small bags, and pseudoephedrine. United States v. Triana, 477 F.3d 1189, 1195 (10th Cir. 2007) (concluding that a

---

[14] Although Rasel Khondaker testified that the cash was on hand to pay distributors for expected deliveries of merchandise, the jury was entitled to find his testimony not credible or otherwise accord it little weight in reaching its verdict. See Allen, 235 F.3d at 492.

jury could infer an intent to distribute drugs from the presence of "scales, glass pipes, and ziploc baggies").

In addition to presenting evidence on each of these five factors, the government also introduced several other kernels of circumstantial evidence furthering its showing of an intent to distribute. For example, DeBruin testified that he observed six to eight individuals walk into the store during the hours immediately preceding the execution of the search warrant, and that none carried any normal convenience store purchases when they left the store. Relatedly, several officers also testified that many of the items on the store shelves appeared to be outdated and were covered in dust, and that several boxes of merchandise appeared to be faded from the sun. The jury reasonably could have inferred from this testimony that the convenience store was in the business of selling drugs to the exclusion of conventional merchandise. Furthermore, McCullough, who was in the store immediately prior to execution of the search warrant, testified that he observed a customer come to the counter, presumably to make a purchase. He noted that Khondaker began reaching under the counter and that the observed transaction only ceased when the SID team arrived. The jury could have inferred from this testimony that Khondaker was reaching for the drugs that police later found directly under the counter to sell some to the customer. Although individually insufficient to prove this element, each of these additional pieces of

evidence strengthened the government's assertion that Khondaker intended to distribute the drugs at issue.

In sum, we conclude that, when assembled together, the pieces of evidence presented were sufficient to form a picture from which the jury could have reasonably concluded that Khondaker possessed the drugs at issue, that he did so knowingly, and that he had the intent to distribute them.

**B**

As to the final count of conviction, Khondaker asserts that the evidence presented at trial was insufficient to support either the "in furtherance" element of 18 U.S.C. § 924(c), or the underlying drug trafficking crime required for conviction. As explained above, we have already concluded that the evidence adduced at trial was sufficient to convict Khondaker under the first four counts of the indictment. Consequently, we need only inquire whether the evidence was sufficient to satisfy the "in furtherance" element of the § 924(c)(1) violation for which he was convicted.

To establish that a firearm has been used in furtherance of a drug trafficking crime, the government must prove some nexus between the possession of the firearm and the drug trafficking activity. United States v. Avery, 295 F.3d 1158, 1179-80 (10th Cir. 2002). That nexus can be shown if the government introduces evidence that the firearm "furthered, promoted or advanced" the underlying drug crime. United States v. Robinson, 435 F.3d 1244, 1251 (10th

Cir. 2006) (quoting United States v. Iiland, 254 F.3d 1264, 1274 (10th Cir.

2001)).  This burden can be met by introducing evidence that the defendant

intended to keep the firearm available for use during a drug transaction.  United

States v. Basham, 268 F.3d 1199, 1208 (10th Cir. 2001).  "Such intent would

necessarily be subject to proof by circumstantial evidence . . . ."  Id.  Several

factors may facilitate circumstantial proof of this intent, including:  "(1) the type

of drug activity being conducted, (2) the accessibility of the firearm, (3) the type

of firearm, (4) the legal status of the firearm, (5) whether the firearm is loaded,

(6) the proximity of the firearm to drugs or drug profits, and (7) the time and

circumstances under which the firearm is found."  Robinson, 435 F.3d at 1251

(citation omitted).

In the case before us, each of the seven factors, save the fourth,[15] tends to

show that the firearms in the store were kept available for use during a drug

transaction.  The evidence presented showed the existence of an apparently large

scale drug operation.  Officers uncovered at least four distinct types of controlled

substances, packaged for retail sale, as well as paraphernalia consistent with both

the manufacture and distribution of the drugs recovered.  All three of the firearms

seized were located within four feet of where Khondaker was standing when he

was apprehended and in close proximity to the drugs; the two handguns were

---

[15] The record is silent on the legal status of the three firearms recovered
during the raid.

found lying in the open directly below the cash register at roughly waist level, and the shotgun was found underneath a nearby counter. The shotgun handle was protruding out from under the counter and was pointed directly towards Khondaker so that he, or another store employee, could easily access it. Each of the firearms was also loaded with ammunition, and the .38 semiautomatic handgun was chamber loaded, meaning that it was ready to be fired immediately. Moreover, all three of the firearms were found in close proximity to the drugs and to the $2,359 in cash that officers recovered. Taken together, these facts provide sufficient circumstantial evidence to prove that Khondaker intended to have the firearms available for use during potential drug transactions, and that they were thus possessed in furtherance of a drug trafficking crime.[16] See, e.g., United States v. Brooks, 438 F.3d 1231, 1238 (10th Cir. 2006) (upholding a § 924(c)(1) conviction where a "loaded revolver was found within ten feet of the recovered evidence of an active methamphetamine laboratory"); Robinson, 435 F.3d at 1251 (affirming a § 924(c)(1) conviction where "the firearm was a fully loaded and

---

[16] Khondaker contends that he, together with the other employees of the store, possessed these firearms as a means of protection from the threat of robbery. He points to Rasel's testimony that a robbery occurred at the Seven Days Food Corner the year prior to Khondaker's arrest. He also notes that the guns behind the counter were there to abate the threat of any future robberies, and that the store was located in a high-crime area. Plausible as these arguments may be, we are obliged to view the evidence in the light most favorable to the government. See Allen, 235 F.3d at 492. Seeing the evidence in that light, we conclude, as discussed above, that the totality of the evidence presented is sufficient for a reasonable jury to find that Khondaker possessed the weapons at issue in furtherance of drug-trafficking activities.

chambered high-powered rifle easily within reach" and was located "in close proximity to drug paraphernalia"); United States v. Lott, 310 F.3d 1231, 1247 (10th Cir. 2002) ("[T]he placement of a loaded, semi-automatic weapon on the driver's seat of a car in which the instrumentalities of methamphetamine manufacturing were also found is sufficient evidence from which a jury could conclude that the purpose of the gun was to provide defense or deterrence in furtherance of attempting to manufacture methamphetamine."); Avery, 295 F.3d at 1180 (upholding a § 924(c)(1) conviction where "five weapons were found in a home from which [the defendant] admitted that he had sold cocaine" in close proximity to cash and cocaine).

## III

Finally, Khondaker raises a Sixth Amendment challenge to our circuit's use of an appellate presumption of reasonableness for those sentences falling within a properly calculated United States Sentencing Guidelines range. See United States v. Kristl, 437 F.3d 1050 (10th Cir. 2006). He does not, however, raise any specific objection to the reasonableness of his within-Guidelines sentence.

In Rita v. United States, 127 S. Ct. 2456, 2463-68 (2007), decided subsequent to briefing in this case, the Supreme Court explicitly sanctioned our circuit's adoption of an appellate presumption of reasonableness for sentences falling within a correctly calculated Guidelines range. That decision, when read

together with our opinion in <u>Kristl</u>, necessarily forecloses Khondaker's sentencing argument.

## IV

Because we hold that there was sufficient evidence for a reasonable jury to find Khondaker guilty beyond a reasonable doubt on all five counts, we **AFFIRM** the judgment of the district court.

ENTERED FOR THE COURT


Carlos F. Lucero
Circuit Judge